[No. A094667. First Dist., Div. Four. July 31, 2001.]

ROYCE FORD, JR., Petitioner, v.
THE SUPERIOR COURT OF ALAMEDA COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

**COUNSEL**

Diane A. Bellas, Public Defender, and Andrew A. Steckler, Deputy Public Defender, for Petitioner.

No appearance for Respondent.

Bill Lockyer, Attorney General, and Ann P. Wathen, Deputy Attorney General, for Real Party in Interest.

**OPINION**

**KAY, J.**—Petitioner Royce Ford, Jr., is charged with the murder of April Matlock. (Pen. Code, § 187.) The information alleges that petitioner personally used a deadly weapon (Pen. Code, § 12022, subd. (b)) and inflicted great bodily injury (Pen. Code, § 1203.075) in committing the offense, and

that he had previously been convicted of welfare fraud (Welf. & Inst. Code, § 10980, subd. (c)(2)).

Petitioner gave a taped statement to the police confessing to the murder. He moved to suppress the confession on the ground that it was the fruit of an illegal arrest, and to suppress physical evidence obtained as a result of the arrest. (Pen. Code, § 1538.5.) The motion was denied.

Petitioner has filed a petition for a writ of mandate and/or prohibition directing that the motion to suppress be granted, and that the information be dismissed. We have issued an order to show cause as to the ruling on the suppression motion, along with a stay of proceedings in the case, and have heard oral argument on the matter. We conclude that suppression of the evidence is not required, and therefore deny the petition for writ of mandate and/or prohibition.

## I.

Petitioner called 911 in Oakland at 3:23 p.m. on November 24, 1999, identified himself, and reported that someone had broken into a house on Hayes Street. He said that one of the doors had been broken off in the bedroom, and that the back window had been opened.

Petitioner placed a second 911 call at 3:37 p.m., identified himself again, and said that he had called a few minutes ago about a break-in. He said that he had gone into the house and "there's blood all over" the second bedroom in the middle of the house. "How long have you been gone from there?" the operator asked. "How long have I been gone?" petitioner responded. "Um-hmm," said the operator. "I was gone all day," said petitioner.

In response to questions from the operator, petitioner said that his sister, her son, her daughter April, and his nephew David lived at the house. He said that his sister had gone into the house, told him she saw blood, and left crying. He said that he did not know where April was, but added, "I think that's her in the room. I think. I don't know." "So you didn't actually go all the way in the room?" the operator asked. "No," petitioner answered, "I didn't, un, because she said cuz' the blood was there. So I just looked. The blood every where."[1] The operator confirmed with petitioner that April was his niece, and was the only one in the household who was "unaccounted

---

[1] A tape recording of the 911 calls was introduced into evidence and played at the hearing on the motion to suppress; a transcript of the calls was also admitted into evidence. The quotations herein are from the transcript, which appears on the whole to be very accurate, but we have listened to the tape itself.

for." The operator asked whether April was having problems with anyone or was suicidal; petitioner said he did not know.

Officer Bellusa testified that petitioner was standing near the doorway of the house when Bellusa arrived there around 3:40 p.m. Petitioner chained the pit bull dog that was roaming around the yard, and said that he had not looked around the house. Bellusa asked petitioner to follow him into the house and point out things that were missing. Bellusa drew his gun and began walking through the house. He passed through the living room and saw that the door to the first bedroom off to the right had been broken down. It appeared that someone had rifled through the bedroom. Drawers had been removed from cabinets, and clothes and papers were scattered. When Bellusa came out of the bedroom he noticed that appellant had stayed behind in the living room, pacing and rubbing his head.

Bellusa walked into the kitchen, and then to the second bedroom, where he saw blood spattered on the wall. The room had a window, but Bellusa recalled that the curtains were only slightly parted and that it was dark inside. He looked down and saw a woman lying on her back on a mattress. She was covered by a sheet up to her neck. Her head was black and blue and part of it had been "caved-in." She appeared to be dead.

Bellusa called for assistance as he backed out of the house. When he got to the living room he put his gun away, turned to petitioner, and asked if he would mind going outside with him. He did not tell petitioner what he had seen. Petitioner "walked out on the steps with [Bellusa] real quick" and asked if anything was wrong. Bellusa said, "no, everything's fine."

Bellusa asked petitioner if he would mind sitting in his patrol car. Bellusa testified that petitioner was very cooperative and "just jumped right in" the back seat of the patrol car, where he was locked in. About 10 minutes later, Bellusa asked petitioner if he would mind going to the police station, where there were people "trained in these type of things that would like to talk to you." Petitioner said that would be fine, and Bellusa drove him to the station. Bellusa testified that petitioner was not handcuffed or under arrest, and remained cooperative at the station.

Bellusa took petitioner into interview room 202 in the homicide department of the criminal investigation division at 5:15 p.m., and told him to knock on the door if he wanted water or needed to use the bathroom. Bellusa testified that "[y]ou could tell at that point he was a little down, but he just—he said okay, that's fine." Bellusa said that petitioner's demeanor changed when they went into the criminal investigation division, and he

"kind of started to look a little pale at that time." The lead investigator in the case, Sergeant Joyner, testified that petitioner could have seen the words "homicide section" as he was being led to the interview room. Joyner said that the room in which petitioner was placed was eight-by-eight feet, with a table, three chairs, no window, and one door. The door locked automatically and could not be opened from the inside without a key.

Joyner arrived at the house around 5:00 p.m., observed that it was surrounded by a six-foot-high chain link fence, and saw the van in the backyard where petitioner lived. The front and rear doors to the house had security gates and appeared undisturbed. Neighbors did not see or hear anything happen at the house that day. However, there was a bucket turned upside down outside a window to a back bedroom, the screen to the window had been pulled off, and the window was open four to six inches and appeared to have been pried; Joyner could not tell if the pry marks were fresh.

In the bedroom with the broken-down door, jewelry had been left on top of a dresser, and drawers were open but their contents were undisturbed. In the bedroom with the open window, clothes had been taken down from a rod and piled on the bed, but a computer, computer disks and computer games were undisturbed. There were pry marks on the lock of the door to that bedroom. In the bedroom where the body of April Matlock was found, the mattress was soaked in blood, and there was blood on all four walls. Matlock was wearing a short mini skirt which was pulled up exposing her vaginal area, and there was fluid between her legs. She had sustained severe blunt trauma to the head.

Joyner spoke with Matlock's grandfather, Royce Ford, Sr., at the scene. Mr. Ford told Joyner that his daughter, Julia Ford, had come to his place of business "hysterical." Joyner returned to the station around 8:00 p.m. to interview Julia and other residents of the house. Records showed that Joyner interviewed Julia from 8:20 to 9:24 p.m.; Charles King, Julia's son and Matlock's brother, from 9:43 to 10:06 p.m.; and David Dogens, King's cousin, from 10:35 to 11:09 p.m. All three signed forms consenting to a search of the house.

Joyner testified that nothing Julia Ford, King or Dogens said cast any suspicion on petitioner. King said that Matlock was working as a prostitute and had been using illegal drugs, including heroin. King said that Matlock had an argument with some people on the porch of the house the night before she was killed, and that those people had threatened her with bodily harm. King and Dogens gave Joyner a description of the people who had threatened Matlock.

Julia Ford told Joyner that she had never heard petitioner even raise his voice to Matlock, although Matlock had called petitioner a "looser (*sic*) or a smoker or something along those lines." Julia said that she and King left the house early in the morning, and always locked the gate so no one could come into the yard. She said that her dog had bitten mailmen and neighbors who tried to enter the yard. She said that when she returned to the house that day, she noticed that her bedroom door had been kicked open and called to petitioner. When she and petitioner went back in the house, she told him to call the police because there was blood in Matlock's bedroom. She said she saw blood when she looked in Matlock's bedroom, but not a body.

Joyner began questioning petitioner at 12:07 a.m. By that point, in addition to conducting the other interviews, Joyner had listened to tapes of petitioner's 911 calls, and reviewed the notes he had taken at the scene, as well as the reports of Bellusa and another officer. Interviewers want "to have as much knowledge as [they] possibly can," Joyner explained, so as to "operate from a position of strength." Joyner had investigated petitioner's criminal record,[2] and spoken with Bellusa, as well as Officers Petty and Yoell, about petitioner's demeanor. Bellusa told Joyner several times, "Something's not right with that guy. I just got a bad feeling about him and he just wasn't acting right."

Petitioner had been in room 202 for almost seven hours before the interrogation started. At 7:31 p.m., Bellusa observed petitioner through the peephole to the room. Petitioner was bent over a table with his head down in his hands, and it sounded like he was crying. At 7:47 p.m., petitioner was asked by another officer to consent to a search of the house, and provided that consent. At 9:41 p.m., petitioner asked to use the rest room; Joyner took him to the bathroom and for a drink of water. Joyner said he told petitioner that he was talking to other family members at the station. Joyner testified that "I apologized to him and told him I was sorry it was taking so long, but we had to talk to other individuals before we got to him and he said he understood."[3] Petitioner asked how his sister Julia was doing; Joyner told him that she was crying, and had gone to Royce Ford, Sr.'s home.

[2]Records indicating that petitioner was on felony probation, with a search condition, were admitted into evidence at the suppression hearing over petitioner's objections on hearsay, relevance, and foundational grounds. The search condition stated that petitioner "shall submit his person, real property, place of residence, vehicle and/or other belongings to search and seizure at any time of the day or night, with or without a search warrant by a probation officer or law enforcement officer."

[3]According to police records, Dogens and King waited at the station over five hours and three hours, respectively, before they were interviewed. Joyner explained that witnesses are interviewed separately to prevent them from being influenced by each others' statements. Joyner said that he interviewed Julia Ford first because she was crying and traumatized. He said that he interviewed Dogens and King before petitioner because he understood that they

Joyner did not tell petitioner that Matlock was dead, or suggest that he was suspect in her murder, until later when he began questioning him. Joyner said that successful interrogations depended on the assertion of control as well as the building of rapport, and acknowledged that he took petitioner to the bathroom to show him that he was in charge. Joyner brought petitioner back to room 202 and told him to knock if he needed anything.

Petitioner was moved from room 202 to an identical room, 201, for his interrogation. Joyner said they moved only because of petitioner's flatulence; he denied that there was urine on the floor of room 202.

Petitioner was interrogated by Sergeants Joyner and Longmire. Joyner read petitioner his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974]) five minutes into the interview after a few preliminary questions on matters such as date of birth, living arrangements, and work history. Petitioner signed a form confirming that he understood his rights, and said, "Yeah, I can answer."

Petitioner was questioned for about an hour about the events of the day. Petitioner said that he had not seen Matlock that day, and "emphatically" denied going into the house before the time of the 911 calls. Petitioner said he went back into the house after the first 911 call because his sister told him she had seen blood. He said he saw blood, but not Matlock's body.

Toward the end of the hour, petitioner was asked whether he had any type of sexual contact with Matlock, and was "really adamant" that no such activity had occurred. Joyner told petitioner that one way to prove that he was being truthful would be to give a blood specimen at a hospital, and petitioner agreed to do so. Petitioner signed a consent at 1:04 a.m. to have his blood examined, and was taken by Joyner and Longmire to Highland Hospital to give blood. Joyner drove the unmarked car, Longmire sat in the passenger seat, and petitioner sat in the back seat. Petitioner was not handcuffed, and the doors to the car were not locked. On the way to the hospital, they went to a Jack-In-The-Box drive-through and Joyner bought dinner for the three of them. Joyner and Longmire talked to petitioner about sports and relationships with women, to try to build a rapport with him. Joyner testified that petitioner was "totally cooperative" while giving blood at the hospital. Joyner thought petitioner "probably felt disrespected" when it was suggested that he might have sexually assaulted his niece, and was "anxious" to prove that his denial was honest.

When they returned to the station at 2:22 a.m., Joyner and Longmire put petitioner back in the interview room and then conferred for 15 minutes

were not at the home when the crime occurred, and their interviews would likely be shorter than that of petitioner.

about their strategy for the next stage of the interrogation. By this time Joyner strongly suspected that petitioner had gone into the house and murdered Matlock.

Joyner testified that his suspicions began with the 911 calls. Joyner thought it inconsistent that petitioner did not mention blood in the first 911 call, and unusual that he did not request medical aid in either call. Joyner was struck by the exchange in the second 911 call when petitioner was asked how long he had been gone from the house, and responded with what Joyner regarded as a "stalling question" before stating that he had been gone all day. Joyner thought that petitioner might have been trying to establish the foundation for an alibi with this statement. Joyner also noticed the "nonchalant way that [petitioner] talked to the dispatcher." In Joyner's view, petitioner did not "display[] the correct emotions" in the 911 calls.

This latter observation coincided with those of officers on the scene, who "for whatever reason, maybe from [petitioner's] demeanor, thought something wasn't right with him." As for petitioner's report of a break-in, it appeared that property in the house had been rifled but that nothing had been taken. Any stranger would have had to negotiate the chain link fence around the house, as well as the locked gates to the property. Also, King and Julia Ford said that the pit bull on the premises would have been "raised up" if any intruder had entered the yard, but the neighbors heard nothing at all at the house that day.

Joyner was also suspicious of petitioner's claim that he had not been in the house that day, because "other family members had informed me it was a common practice for [petitioner] to wake up in the morning and come into the house, brush his teeth, use the rest room and kind of freshen up, things of that nature." Joyner added: "Whenever we approached that subject, [petitioner] was back pedaling and made up excuses why he hadn't any reason to go into the house that particular morning, as well as without [my] even asking, giving information that he wasn't around, type answers."

Based on these suspicions, Joyner resolved to "turn[] on the interview techniques to see . . . what might turn up." Joyner taught and used methods described in the police department's Advanced Interviewing Techniques manual. The officers decided to emphasize two themes in their questioning: the victim "can rub people the wrong way" theme; and the "there [are] two sides to every story, let's hear your side" theme. This was the technique of giving the suspect two guilty options to explain what happened. In addition to the "rapport and control" and "guilty options" techniques, the officers began to employ "anchoring," the "highly manipulative tool" of touching

petitioner in a positive or negative manner depending on whether they thought he was being truthful, and "invasion of space," which meant moving to within a foot of petitioner when he appeared to be lying, and moving back when he appeared to be telling the truth.

When the questioning resumed at 2:39 a.m., Joyner began by confronting petitioner with inconsistencies in his statements. Joyner finally got petitioner to admit that he had gone into the house on the day of the murder by using the "nosy neighbor ploy": suggesting that a neighbor might have seen him in the house, when in fact no neighbor had reported that observation. This admission, in Joyner's view, was the turning point in the interrogation.

At some point petitioner said, "I don't like the situation," and Joyner said that when he heard this, he "knew" petitioner had murdered Matlock. Joyner explained: "It wasn't just that simple phrase. It wasn't just him saying that statement in any different tone or anything like that. [¶] It was the totality of the whole investigation, everything put together, his actions verbally and nonverbally. Him saying things that basically a normal person would be sad over, [petitioner] didn't exhibit any type of sadness or for lack of a better word emotion. And when he said that, I just got that feeling, that this is it and he's the one who did it."

Petitioner said that Matlock approached him when he went into the house and was verbally abusive toward him. Joyner testified that this conduct on Matlock's part was consistent with the descriptions other family members had given of her. Petitioner said that Matlock threw something at him and physically attacked him, and that in response he hit her with a hammer. He initially said that he did not remember how many times, or where, he hit Matlock. He eventually admitted hitting Matlock several times in the head. He also admitted kicking in the door to the first bedroom and breaking into the back bedroom.

Petitioner provided a tape-recorded statement at 3:50 a.m. Petitioner confirmed at the outset of the statement that he had been informed of his *Miranda* rights and agreed to answer questions. He said that when he got up in the morning the day before and went into the house to clean up, Matlock started screaming and cussing at him. She threw things at him and then started hitting him; he did not know why she was upset. He hit her with his hand but she would not quit, so he hit her with a hammer he had brought in to do some work on the porch. He struck her with a motion "like I was

throwin' a fastball overhand."[4] He first said that he did not know how many times he hit her, but in response to further questions said that he hit her once in the chest, and then four times in the face. When she stopped moving, he put the hammer away in a toolbox underneath the back stairs of the house.

Petitioner said he kicked in the door to his sister's room because he was scared and did not know what to do. He was asked if he was trying to make it appear that there had been a burglary at the house, and he said, "Yeah, I think I was tryin' to do that." In the back bedroom, he forced the door open, opened the window and pushed out the screen to make it look like someone had left through the window.

Matlock had fallen onto her bed. Petitioner said he put a blanket over her and a pillow over her head and left her there on her stomach. He did not go back into the house until his sister came home. He said he thought Matlock had left the house by that point.

Petitioner said that he smoked a little crack after his fight with Matlock, but that he had been sober during their encounter, and that he was sober when he gave his statement. He confirmed that he had given his statement freely, that he had been fed, and that the officers had been cordial to him. Petitioner was placed under arrest after providing the statement.

Joyner said he thought when he arrived at the crime scene that he had "reasonable suspicion for detention" of petitioner, but "[i]nstead of going that route, as far as arresting him under probable cause or detaining him, I appealed to his goodness and heart and asked if he would cooperate and come down to the police station and asked him to cooperate and take [*sic*] a statement, which he agreed to do."[5] "At that point," Joyner continued, he was not "worrying about if [petitioner] was under arrest or probable cause wasn't even anything of an issue to me due to the fact that [petitioner] agreed to come to the police department."

Joyner testified that, at various points in the ensuing investigation, he believed that he had grounds for suspicion that petitioner was involved in the crime, as opposed to probable cause to arrest him. When Joyner was asked at the hearing, "In your mind, what time was [petitioner] arrested?" he replied, "I can't really answer that. I was in the process of processing all the information, gathering witness statements and looking at all the inconsistencies. Obviously, when [petitioner] ended up telling me he was responsible

---

[4]A tape recording of the statement was introduced into evidence and played at the hearing on the motion to suppress; a transcript of the statement was also admitted into evidence. The quotations herein are from the transcript, but we have listened to the tape itself.

[5]In view of Joyner's other testimony that he did not speak with petitioner at the crime scene, it is apparent that these requests were conveyed to petitioner through Officer Bellusa.

for hitting Ms. Matlock in the head with a hammer, obviously in my mind he was under arrest."

Joyner said that petitioner never asked to leave the station, and was never told before he furnished the statement that he was not free to leave. Joyner testified that petitioner was in fact never free to "just stand up and walk out," but explained that he would have had to decide whether to keep petitioner at the station if petitioner had ever asked to leave.

## II.

The trial court found that petitioner was under "de facto arrest" when the police began questioning him shortly after midnight on November 25. At that point, the court concluded, the police had sufficient cause to detain petitioner, but not probable cause to arrest him. The court observed that Joyner had essentially admitted the lack of probable cause. ▄▄ The court then applied the standards set forth in *Brown v. Illinois* (1975) 422 U.S. 590 [95 S.Ct. 2254, 45 L.Ed.2d 416], for admission of a confession obtained after an illegal arrest. "Those factors are: [1] the giving of a *Miranda* warning, [2] the temporal proximity of the arrest and confession, [3] the presence of intervening circumstances and [4] the purpose and flagrancy of the official misconduct." (*People v. Gonzalez* (1998) 64 Cal.App.4th 432, 442 [75 Cal.Rptr.2d 272].) The court found that neither the passage of time nor any intervening circumstances broke "the causal chain" (*Brown v. Illinois, supra*, at p. 602 [95 S.Ct. at p. 2261]) between the arrest and the confession. However, the court declined to suppress the confession because a *Miranda* warning had been given, and the court found no flagrant police misconduct.

## III.

▄▄ The threshold issue is whether petitioner was "seized" before he made his incriminating statements. The People argue that the confession was preceded by a consensual encounter between petitioner and the police. The court below implicitly rejected this argument when it concluded that petitioner was under arrest by the time his interrogation began.

▄▄ "Police contacts with individuals may be placed into three broad categories ranging from the least to the most intrusive: consensual encounters that result in no restraint of liberty whatsoever; detentions, which are seizures of an individual that are strictly limited in duration, scope, and purpose; and formal arrests or comparable restraints on an individual's liberty. [Citations.] . . . Consensual encounters do not trigger Fourth

Amendment scrutiny. [Citation.] Unlike detentions, they require no articulable suspicion that the person has committed or is about to commit a crime." (*In re Manuel G.* (1997) 16 Cal.4th 805, 821 [66 Cal.Rptr.2d 701, 941 P.2d 880].)

"Although there is no 'bright-line' distinction between a consensual encounter and a detention . . . 'the police can be said to have seized an individual "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." ' " (*People v. Verin* (1990) 220 Cal.App.3d 551, 556 [269 Cal.Rptr. 573]; see also *Florida v. Bostick* (1991) 501 U.S. 429, 438 [111 S.Ct. 2382, 2388, 115 L.Ed.2d 389] [" 'reasonable person' test presupposes an *innocent* person"].) " 'The test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation.' " (*People v. Verin, supra,* at p. 556.) "The officer's uncommunicated state of mind and the individual citizen's subjective belief are irrelevant in assessing whether a seizure triggering Fourth Amendment scrutiny has occurred." (*In re Manuel G., supra,* 16 Cal.4th at p. 821.)

■ The standards for appellate review of suppression motion rulings are well settled. (*People v. Coulombe* (2000) 86 Cal.App.4th 52, 55-56 [102 Cal.Rptr.2d 798].) "We defer to the trial court's factual findings, express or implied, where supported by substantial evidence." (*People v. Glaser* (1995) 11 Cal.4th 354, 362 [45 Cal.Rptr.2d 425, 902 P.2d 729].) However, " 'it is "the ultimate responsibility of the appellate court to measure the facts, as found by the trier, against the constitutional standard of reasonableness." ' " (*People v. Loewen* (1983) 35 Cal.3d 117, 123 [196 Cal.Rptr. 846, 672 P.2d 436].)

■ These settled standards have not been uniformly applied in distinguishing between seizures and consensual encounters. (Compare, e.g., *In re Gilbert R.* (1994) 25 Cal.App.4th 1121, 1126 [30 Cal.Rptr.2d 676] [treating issue as one of fact]; *People v. Meredith* (1992) 11 Cal.App.4th 1548, 1561, fn. 8 [15 Cal.Rptr.2d 285] [same]; *People v. Shields* (1988) 205 Cal.App.3d 1065, 1073 [252 Cal.Rptr. 849] [same]; with *People v. Franklin* (1987) 192 Cal.App.3d 935, 940 [237 Cal.Rptr. 840] [treating issue as one of law]; *People v. Bailey* (1985) 176 Cal.App.3d 402, 406 [222 Cal.Rptr. 235] [same]; see also *U.S. v. Valdiosera-Godinez* (5th Cir. 1991) 932 F.2d 1093, 1098, fn. 1 [federal circuits are split on the point].) The issue was treated as one of fact in *In re Manuel G., supra,* 16 Cal.4th at pages 822, 823, 825; in that case, however, the issue was not presented in connection with a motion to suppress. The minor in *Manuel G.* was found to have threatened a peace

officer to deter the performance of his duties. (Pen. Code, § 69.) The minor argued that he was illegally detained by the officer when he made the threats, but the court held that substantial evidence supported an implied finding that the encounter was consensual. (*In re Manuel G., supra,* at p. 823.) In so concluding, the court applied the rules of appellate review for judgments (*id.* at p. 822), rather than those for suppression rulings.

In any event, even if the seizure issue were ordinarily one of fact, we would be called upon to exercise our independent judgment in this instance because the evidence on petitioner's motion was undisputed. (*People v. Aldridge* (1984) 35 Cal.3d 473, 477 [198 Cal.Rptr. 538, 674 P.2d 240] [where evidence is undisputed "there is no factual issue entitled to a substantial evidence standard of review"]; *People v. Leyba* (1981) 29 Cal.3d 591, 597, fn. 1 [174 Cal.Rptr. 867, 629 P.2d 961]; *People v. Verin, supra,* 220 Cal.App.3d at p. 555; *People v. Capps* (1989) 215 Cal.App.3d 1112, 1119 [263 Cal.Rptr. 791]; *People v. Perez* (1989) 211 Cal.App.3d 1492, 1494 [260 Cal.Rptr. 172].) There is no basis to suspect that the trial court may have disbelieved any of the officers' uncontradicted testimony about how they treated petitioner, or what petitioner said or did. To the contrary, the court found that the police were, as they said, polite to petitioner, not threatening or intimidating, and it "was at least clear to [the court] throughout the testimony that was presented . . . that [petitioner] had cooperated the whole time with the police."

The Fourth Amendment does not prevent a person from agreeing to accompany officers to the police station and remain there for interrogation. (See *In re Gilbert R., supra,* 25 Cal.App.4th at pp. 1125-1126 [no seizure where minor agreed to go to station for questioning]; *Craig v. Singletary* (11th Cir. 1997) 127 F.3d 1030, 1032-1034, 1040-1042 [no seizure where defendant went with police to station and stayed there five hours before probable cause developed for his arrest].) "[A] suspect's appearance at the station for some period of time might be by consent and thus no arrest nor any type of seizure whatsoever." (3 LaFave, Search and Seizure (3d ed. 1996) § 5.1(a), p. 4 (hereafter LaFave).) The question is whether the consent was voluntary. (*Id.*, at pp. 4-5.)

The issue has been presented in at least two California cases. In *In re Gilbert R., supra,* 25 Cal.App.4th 1121, the police went to the home of a minor to investigate an assault. They obtained the minor's permission and that of his mother to take the minor to the police station for questioning. The minor confessed at the station after being advised of his constitutional rights. The confession was admissible because "substantial evidence supported the implied finding of the juvenile court that when all of the circumstances are

viewed objectively, a reasonable person would have believed that he or she did not have to accompany the detectives to the . . . station." (*Id.* at p. 1126.)

In *People v. Boyer* (1989) 48 Cal.3d 247, 267 [256 Cal.Rptr. 96, 768 P.2d 610], however, the court rejected a claim that an encounter between the defendant and the police "was consensual, and thus not a detention," and concluded that the defendant's interrogation occurred "during an illegal, prolonged detention amounting to arrest."[6] Four officers went to the defendant's house one evening to seek what they called a "voluntary interview" about his possible involvement in two homicides. (*Boyer,* at p. 263.) Two officers knocked on the front door while the other two covered the rear of the house; the defendant was stopped when he emerged from the back door after the knock. The defendant was asked to step into the driveway and told that "two gentlemen in front would like to speak to him." (*Ibid.*) The officers may have held the defendant as they walked him to the front of the house. The defendant was then asked if he would "voluntarily come" to the station for an interview, and agreed to do so. (*Id.* at p. 264.)

The court agreed with the defendant that "many of the formal indicia of detention or arrest were present during the initial encounter with the officers . . . . The manner in which the police arrived at defendant's home, accosted him, and secured his 'consent' to accompany them suggested they did not intend to take 'no' for an answer." (*People v. Boyer, supra,* 48 Cal.3d at pp. 267-268.) And "[w]hatever defendant's status before arriving at the . . . station . . . the situation quickly ripened into a full-blown arrest inside the station house." (*Id.* at p. 268.) At the station, the defendant was confronted by two officers in a small interrogation room, informed of his *Miranda* rights, and subjected to over an hour of "directly accusatory questioning" while the officers evaded his questions about whether he was under arrest. (*Ibid.*)

The situation in petitioner's case is distinguishable from those in *Gilbert R.* and *Boyer.* In *Gilbert R.,* it was dispositive that the initial agreement to go to the station was voluntary. Insofar as it appears from the opinion, the interrogation began as soon as the minor arrived. The opinion noted that at one point, after the minor said he was hungry and the officers went to buy him breakfast, he was left in an office with the door open, and told to direct any questions to investigators in a nearby room. The court did not need to address whether this unremarkable development caused the encounter to " 'lose[] its consensual nature.' " (*In re Gilbert R., supra,* 25 Cal.App.4th at

---

[6]*Boyer* was disapproved on another ground in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1 [38 Cal.Rptr.2d 394, 889 P.2d 588].

p. 1125.) Unlike the minor in *Gilbert R.*, petitioner remained at the station for an extended period before he was questioned. Thus, we must consider whether, even if petitioner's initial consent to accompany the police was voluntary, the encounter remained consensual at the station. We note also that, unlike petitioner, the suspects in *Gilbert R.* and *Boyer* did not initiate contact with the police.[7] *Boyer* is further distinguished by the coercive manner in which the police obtained the defendant's consent to go to the station, and here, unlike *Boyer*, the police were never evasive about petitioner's custodial status (he never asked).

The unique facts of petitioner's case must therefore be examined in light of the governing general principles. ▮ It is "[o]nly when the [police], by means of physical force or show of authority, in some manner restrain[] the individual's liberty [that] a seizure occur[s]." (*In re Manuel G.*, *supra*, 16 Cal.4th at p. 821.) Other factors include, on one hand, whether "the police specifically advised the suspect that he was not under arrest or that he was free to leave if he wished" (3 LaFave, *supra*, § 5.1(a), p. 5), and, on the other hand, whether "the police put the matter to the suspect only in terms of a request or did not in any way indicate to him that he was a suspect" (*id.* at p. 6, fn. omitted). "Courts also take into account facts tending to show that the suspect 'deliberately chose a stance of eager cooperation in the hopes of persuading the police of his innocence.'" (*Id.* at p. 8.)

▮ According to undisputed evidence, petitioner exhibited a desire to cooperate at regular intervals throughout the entire time before he confessed. This cooperation began before petitioner arrived at the station: around 3:30 p.m. he initiated contact with the police through the 911 calls; at 3:40 p.m. he agreed to follow the responding officer into the house to point out missing items; shortly thereafter he agreed to leave the house, and wait in the officer's patrol car; about 10 minutes later he agreed to accompany the officer to the station. This cooperation continued after petitioner arrived at the station: at 5:15 p.m. he said "okay, that's fine" when he was put in the locked room and told to knock if he needed anything; at 7:47 p.m. he consented to a search of the house; at 9:41 p.m. he said he "understood" when the sergeant apologized for the time it was taking to interview other witnesses. This cooperation continued when petitioner was interrogated: at 12:07 a.m. he waived his *Miranda* rights and said he could answer questions; at 1:04 a.m. he agreed to provide a blood specimen; and finally, before the questioning resumed at 2:39 a.m., he accompanied the police to a hospital,

---

[7]This fact, and the continuing indicia of consent from petitioner, also distinguish the situations in *Green v. Superior Court* (1985) 40 Cal.3d 126 [219 Cal.Rptr. 186, 707 P.2d 248], and *People v. Aguilera* (1996) 51 Cal.App.4th 1151 [59 Cal.Rptr.2d 587], cases cited in the petition for rehearing that involved *Miranda* issues.

where he remained "totally cooperative" while giving blood and seemed "anxious" to prove his innocence.

It thus appears that petitioner, from the moment he summoned the police to the scene, " 'deliberately chose a stance of eager cooperation in the hopes of persuading the police of his innocence.' " (3 LaFave, *supra*, § 5.1(a), p. 8.) The record establishes that petitioner was unfailingly cooperative and remained eager to prove his veracity even after the interrogation began. In these circumstances the police could reasonably rely on petitioner's apparent consent. (See *id.*, § 8.1(b), pp. 609-610.)

Other relevant considerations do not dictate a contrary conclusion. Petitioner's movement was impeded in the back seat of the police car on the way to the station and in the locked room at the station, but he was not restrained by any physical force or show of authority. He was never handcuffed, and was left in the unlocked backseat of the police car on the trip to the hospital. Petitioner's cooperation was requested not demanded, and he was not told that he was a suspect before he was questioned. Although petitioner was never told in so many words that he was not under arrest or that he was free to leave, that advice was implicit in the sergeant's apology for the time it was taking to interview other witnesses. Petitioner was advised of his *Miranda* rights before he was questioned about the crime.

Under the totality of the circumstances, we conclude that petitioner was not seized before he confessed. Accordingly, petitioner's claim that his confession was the fruit of an illegal arrest is without merit, and the court was correct to deny his motion to suppress.

## IV.

The petition for writ of mandate and/or prohibition is denied, and the order staying further proceedings is vacated.

Reardon, Acting P. J., and Sepulveda, J., concurred.

A petition for a rehearing was denied August 28, 2001, and the opinion was modified to read as printed above. Petitioner's petition for review by the Supreme Court was denied November 14, 2001. Kennard, J., was of the opinion that the petition should be granted.