Filed 3/26/13  P. v. Lu CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>KEVIN LU,<br><br>    Defendant and Appellant. | H037846<br>(Santa Clara County<br>Super. Ct. No. C1113650) |

After the court denied his Penal Code section 1538.5 motion to suppress evidence, Kevin Lu (appellant) entered no contest pleas to one felony count of possession of a controlled substance (Health & Saf. Code, § 11377, subd. (a), count one) and one count of possession of drug paraphernalia (Health & Saf. Code, § 11364, count two).

On January 13, 2012, the court suspended imposition of sentence and admitted appellant to probation pursuant to Proposition 36 (Pen. Code, § 1210 et seq.).  The court imposed various fines and fees.  Relevant to this appeal, the court did not calculate or award appellant any presentence custody credits.

Appellant filed a timely notice of appeal.  On appeal, appellant challenges the denial of his suppression motion and contends that the court erred in failing to calculate his presentence custody credits.  For reasons that follow we reverse the judgment.

*Discussion*

*Motion to Suppress*

Appellant contends that he was deprived of his rights under the Fourth and Fourteenth Amendments when he was subjected to an illegal search and seizure.

A defendant may move to suppress evidence obtained as the result of an unreasonable search. (Pen. Code, § 1538.5, subd. (a)(1).) Challenges to the admissibility of a search or seizure must be evaluated solely under the Fourth Amendment. (*People v. Carter* (2005) 36 Cal.4th 1114, 1141.)

"Police contacts with individuals may be placed into three broad categories ranging from the least to the most intrusive: consensual encounters that result in no restraint of liberty whatsoever; detentions, which are seizures of an individual that are strictly limited in duration, scope, and purpose; and formal arrests or comparable restraints on an individual's liberty. [Citations.]" (*In re Manuel G.* (1997) 16 Cal.4th 805, 821 (*Manuel G.*).)

In reviewing the trial court's denial of a suppression motion, we defer to the trial court's factual findings if supported by substantial evidence, but exercise our independent judgment to determine whether, on the facts found, the search or seizure was reasonable under the Fourth Amendment. (*People v. Camacho* (2000) 23 Cal.4th 824, 830; *People v. Glaser* (1995) 11 Cal.4th 354, 362; *People v. Weaver* (2001) 26 Cal.4th 876, 924.)

The Fourth Amendment proscribes " '. . . unreasonable searches and seizures . . . .' " (*United States. v. Mendenhall* (1980) 446 U.S. 544, 550 (*Mendenhall*).) A consensual encounter with a police officer is neither unreasonable nor is it a seizure. (*Id.* at pp. 554–555.) As an example, a consensual encounter occurs when an officer approaches a person in public and asks how he or she is doing, or questions a person at a crime scene in a non-accusatory and routine manner to determine whether he or she may have information about the crime. (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1081.)

2

As opposed to a consensual encounter, "a detention is a seizure within the meaning of the Fourth Amendment of the United States Constitution; a seizure occurs when an officer restrains a person's liberty by force or show of authority. [Citation.]" (*Ibid.*)

" 'Although there is no "bright-line" distinction between a consensual encounter and a detention . . . "the police can be said to have seized an individual 'only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' " ' [Citations.] ' "The test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation." ' [Citation.]" (*Ford v. Superior Court* (2001) 91 Cal.App.4th 112, 124.) "Circumstances establishing a seizure might include any of the following: the presence of several officers, an officer's display of a weapon, some physical touching of the person, or the use of language or of a tone of voice indicating that compliance with the officer's request might be compelled. [Citations.]" (*Manuel G., supra,* 16 Cal.4th at p. 821.) "In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person." (*Mendenhall, supra,* 446 U.S. at p. 555.) Nevertheless, an officer's "words and verbal tones are always considered," along with how an officer physically approaches the subject, or if the officer attempts to block the subject's path. (*People v. Garry* (2007) 156 Cal.App.4th 1100, 1110–1112.) "The officer's uncommunicated state of mind and the individual citizen's subjective belief are irrelevant in assessing whether a seizure triggering Fourth Amendment scrutiny has occurred. [Citation.]" (*Manuel G., supra,* 16 Cal.4th at p. 821.)

To put it another way," [a]s long as a reasonable person would feel free to disregard the police and go about his or her business, the encounter is consensual and no reasonable suspicion is required on the part of the officer." (*Manuel G., supra,* 16 Cal.4th at p. 821.)

3

Although both "detentions" and "arrests" are seizures under the Fourth Amendment, distinctions are drawn between the two concepts since "the constitutional standard for permissible detentions 'is of lesser degree than that applicable to an *arrest*.' [Citation.]" (*People v. Hester* (2004) 119 Cal.App.4th 376, 386.) Thus, "[A]n officer who lacks probable cause to arrest can conduct a brief investigative detention when there is ' "some objective manifestation" that criminal activity is afoot and that the person to be stopped is engaged in that activity.' [Citations.] Because an investigative detention allows the police to ascertain whether suspicious conduct is criminal activity, such a detention 'must be temporary and last no longer than is necessary to effectuate the purpose of the stop.' [Citations.]" (*People v. Celis* (2004) 33 Cal.4th 667, 674.) Under such circumstances, in *Terry v. Ohio* (1968) 392 U.S. 1 (*Terry*), the United States Supreme Court created a limited exception that allows police officers to "stop and . . . frisk for weapons" when they have an "articulable suspicion [the] person has committed or is about to commit a crime." (*Florida v. Royer* (1983) 460 U.S. 491, 498.) It is well established that when an officer has reason to believe that his suspect is armed and dangerous he may conduct a superficial weapon search. (*Adams v. Williams* (1972) 407 U.S. 143, 145.)

To justify a detention, that is, to make it a lawful detention, "the circumstances known or apparent to the officer must include specific and articulable facts [which would cause the officer] to suspect that (1) some activity relating to crime has taken place or is occurring or about to occur, and (2) the person [the officer] intends to stop or detain is involved in that activity." (*In re Tony C.* (1978) 21 Cal.3d 888, 893 (*Tony C.*), superseded on other grounds by Cal. Const., art. I, § 28.) Of course, "[t]he corollary to this rule . . . is that an investigative stop or detention predicated on mere curiosity, rumor, or hunch is unlawful, even though the officer may be acting in complete good faith . . . ." (*Ibid.,* citing *Terry, supra*, 392 U.S. at p. 22.)

4

In order to address this issue, we set forth in detail the evidence adduced at the suppression hearing and the trial court's factual findings.

San Jose Police Officer Michael Panighetti testified that on the morning of August 15, 2011, at approximately 4:45 in the morning, he was on patrol in a marked police car; he was in full uniform, which included his standard weapons—service weapon, taser, pepper spray and baton. As he was driving he saw two people walking on the street; originally they had been standing in the shadow under a tree between Nakomas Street and Ridgebrook when he first saw them. As the people walked on, Officer Panighetti saw that one person was a man and the other a woman. The man was pushing a bicycle.[1] As the officer turned onto Ridgebrook and drew parallel with appellant and his companion, he asked them what they were doing. Appellant's companion told the officer that they were out for a walk; the officer asked if either of them was on probation or parole. Appellant's companion said she was on parole; at this time the officer was approximately 10 feet away from appellant and his companion talking out of the window of his patrol car. Officer Panighetti's patrol car was facing north in the southbound lane with the "nose" of the car centered toward the curb; he was approximately two to three feet from the curb and had the patrol car's headlights on.

After appellant's companion stated that she was on parole, Officer Panighetti got out of his patrol vehicle, shut the door but he left the patrol car headlights on. Officer Panighetti testified that he looked at appellant's female companion and motioned for her to come to him with his right arm by pointing his right arm forward and cupping his right hand and waving it back and forth; he said come here. At this time, appellant and his companion were standing about four feet apart with appellant slightly to the officer's right. According to Officer Panighetti he made eye contact with only appellant's female companion, but he did have defendant in his peripheral vision. Appellant's female

_____

[1] In court, Officer Panighetti identified appellant as the man with the bicycle.

5

companion immediately took approximately two steps toward the officer; at the same time appellant walked forward. Appellant was still holding his bicycle and was coming toward the officer at a quicker pace than his female companion. The female companion stopped and Officer Panighetti told her to stay still; he asked appellant to put down his bicycle.[2] Appellant put the bicycle on its kickstand and continued to walk toward the officer. Appellant walked right up to the officer. At the time, appellant was dressed in a sweater and jeans; in court the officer described the clothing as not tight, rather it was loose. Officer Panighetti grabbed one of appellant's hands and asked him to turn around; the officer conducted a pat search on appellant. In a pocket, the officer felt what his experience taught him was a methamphetamine pipe. After asking appellant twice if the object that he was feeling was a pipe, appellant admitted it was. Officer Panighetti handcuffed appellant and informed him he was being "detained" in relation to the methamphetamine pipe. At this point another officer arrived and took appellant to the rear of Officer Panighetti's patrol car.[3]

In denying the suppression motion the court made the following findings. "[T]here was not sufficient evidence in the initial contact of [appellant] as well as with the woman that was on parole to justify a detention at that time. [¶] I [do] not think that that initial contact was a detention. I think it was a citizen contact and an officer doing

---

[2]    Specifically, Officer Panighetti testified "once she started coming towards me, she stopped, so I had her stay there and I had him come to me since he was now walking towards me and he was a little closer than she was." Conspicuous by its absence is any testimony by the officer that at this point in time he felt threatened by appellant's approach.

[3]    The prosecutor intended to call this officer to testify that in a search incident to arrest he found the pipe and a gram of methamphetamine. However, the court found that the officer's testimony was not relevant to the issue before the court and defense counsel said she would "accept the offer of proof with respect" to this officer, so long as the court would exclude the evidence in the event the court granted the suppression motion. The prosecutor was in full agreement with this procedure. Accordingly, the officer did not testify. We take this to mean that the parties were stipulating that the officer seized a pipe and the methamphetamine.

6

exactly what would be expected of them is to contact the person that's walking late at night and to see what they're doing, so there was nothing inappropriate raising conduct by the officer of a citizen con[tact] to a detention, nor was there any justification for a detention . . . ." The court determined that the detention occurred when "the officer directed [appellant] to put the bike down. That at that point there was specific commands in the direction and directed at [appellant]." The court found that Officer Panighetti was "credible that his questioning and motions were directed specifically at the woman that was on parole" and so when appellant "began to walk towards the officer -- even if [appellant] innocently interpreted the motion and the statements to the woman that he was with to include him, that doesn't change the officer's safety concerns that now late at night alone in extremely close proximity certainly in proximity to use a weapon . . . at four or five feet . . . . [¶] I think at that time the officer was justified in a brief pat-down search. Again two people there. One of them a parolee. There is no right to search a person with a parolee, but I do think it is a fair assumption that when a parolee is present, that causes a heightened sense of officer safety, and that as soon as he began to approach -- even if he was misinterpreting the officer's directions to the woman on parole, that that justified the officer in a brief detention to pat down for weapons . . . ." The court concluded, "I don't think there was reasonable articulable suspicion of criminal activity in the initial contact really at any time, but there was a legitimate set of concerns once [appellant] approached the officer in close proximity, and that was a valid basis for the detention." Thus, as can be seen, the court justified the detention on officer safety grounds.

Although we believe that it is a very close case as to whether appellant was detained when initially stopped by Officer Panighetti (see *People v. Garry, supra,* 156 Cal.App.4th at p. 1111 [after only five to eight seconds of observing the defendant from his marked patrol car, the officer bathed defendant in light, got out of his car and armed and in uniform briskly walked 35 feet and directly questioned defendant about his legal

status]), we agree with the trial court that appellant was detained the moment the officer told him to put down his bicycle and appellant complied. At that point in time, a reasonable person would not have felt free to leave because to do so would have entailed leaving behind his or her personal property.[4]

*Terry, supra*, 392 U.S. 1, established the standards for search and seizure that we must follow here. "At issue in [*Terry*] was the constitutionality of a police procedure commonly known as a 'frisk' or 'pat-down' in which police officers conducting an investigation search a suspect for concealed weapons. Describing the procedure as 'a serious intrusion upon the sanctity of the person,' the United States Supreme Court nevertheless concluded that it was not 'unreasonable' if the police officer could 'point to specific and articulable facts which, taken together with rational inferences from those facts,' would warrant the intrusion. [Citation] Because the 'intrusion upon the sanctity of the person' consists not only of the patdown itself but also of the temporary detention during which the patdown occurs, to justify frisking or patting down a person . . . 'the officer must first have constitutional grounds to insist on an encounter, to make a *forcible* stop.' [Citation.]" (*People v. Souza* (1994) 9 Cal.4th 224, 229.)

To put it another way, in order to lawfully detain an individual, even temporarily, an officer must have a reasonable, articulable suspicion that the person has committed or is about to commit a crime. (*Illinois v. Wardlow* (2000) 528 U.S. 119, 123.) The temporary detention of a person for the purpose of investigating possible criminal activity, because it is less intrusive than an arrest, must be based on "some objective manifestation" that criminal activity is afoot and that the person to be stopped is engaged in that activity. (*United States v. Cortez* (1981) 449 U.S. 411, 417 & fn. 2.) Inchoate concerns for officer safety may justify certain minimal intrusions. However, a

---

[4]     Respondent agrees that to the extent that appellant complied with Officer Panighetti's direction to put down his bicycle, the court was correct in finding a detention at this point.

reasonable, articulable suspicion of criminal activity is still needed to justify the initial detention. (*Terry, supra*, 392 U.S. at p. 21; *Tony C.*, *supra*, 21 Cal.3d at p. 893.) Conspicuous by its absence in this case is any evidence that appellant was engaged in any criminal activity at any time during his encounter with Officer Panighetti.

Respondent contends that the companion of a person subject to search may, under certain circumstances be detained while officers conduct a search of that person.

In *People v. Samples* (1996) 48 Cal.App.4th 1197 (*Samples*), four officers executing a warrant to search an apartment and its two residents were told the two subjects would be returning in a particular car. (*Id.* at p. 1200.) When that car arrived outside the apartment, the officers asked the defendant, who was driving, to get out so that the two suspects could get out of the backseat; the officers pat searched him when he did so. (*Ibid.*) The search was held justified because the four police officers were dealing, at night, with five occupants of a car, two of whom were subjects of a search warrant. The officers were " 'engaged in an undertaking fraught with the potential for sudden violence' " and it would be " 'utter folly' to require them to wait to search so as to protect themselves until there is 'an overt act of hostility.' " (*Id.* at p. 1210.)

The circumstances in *Samples* were significantly different, and the reasoning of that case cannot be extended to authorize the search here. As noted, in *Samples,* police officers had a warrant, based on probable cause to search two individuals suspected of possessing methamphetamine for sale. (*Samples, supra,* 48 Cal.App.4th. at p. 1200.) At 9:40 at night, the officers stopped a car in which these suspects and three other individuals were riding. (*Id.* at pp. 1200, 1210.) Considering all of these circumstances-- the time of night, the fact that officers were dealing with five people exiting from a car, and the apparent relationship of the car's other occupants to the two passengers who were the subject of drug-related warrants--the court concluded the police were justified in conducting pat searches of the occupants to ensure officer safety. (*Id.* at pp. 1210-1212.) However, in this case appellant's companion was not the subject of a warrant, and she

9

was not suspected of being a drug dealer or at the time when she was stopped being involved in criminal activity of any kind. Nor were the other officer safety concerns in *Samples* present here. In *Samples*, the officers were dealing with suspected drug dealers.[5] Further, in contrast to appellant, the defendant in *Samples* "was more than just a casual, sidewalk companion of a person who was the subject of a warrant . . . ." (*Id.* at p. 1212.) Appellant was simply walking on the street with a companion while pushing a bicycle in the early hours of the morning. A time, 5 a.m., when it is reasonable to believe they could have been walking to or home from work. As the trial court found, there were no suspicious circumstances attached to their presence on the street at that time in the morning. Further, Officer Panighetti did not testify that he felt threatened at any time, even when appellant was walking toward him.

" 'In evaluating the validity of an officer's investigative or protective conduct under *Terry*, the "touchstone of our analysis . . . is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.' " ' [Citation.]" (*People v. Thurman* (1989) 209 Cal.App.3d 817, 824; see also *People v. Rivera* (1992) 8 Cal.App.4th 1000, 1006.) "Central to the *Terry* court's understanding of reasonableness is the requirement of 'specificity in the information upon which police action is predicated . . . .' [Citation.] Thus, 'in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.' [Citation.]" (*People v. Glaser, supra,* 11 Cal.4th at p. 363.) An officer need not be certain that the individual is armed; the fundamental test is "whether a reasonably prudent man in the

---

[5]   The unfortunate association between drug dealers and possession of weapons has often been recognized. (See *U.S. v. Sakyi* (4th Cir.1998) 160 F.3d 164, 169; *People v. Glaser, supra,* 11 Cal.4th 354, 367-368; *People v. Collier* (2008) 166 Cal.App.4th 1374, 1378; *People v. Limon* (1993) 17 Cal.App.4th 524, 535 [noting it was not unreasonable for officer to assume a suspected drug dealer might be armed].) "Firearms are, of course, one of the ' "tools of the trade" ' of the narcotics business. [Citation.]" (*People v. Ledesma* (2003) 106 Cal.App.4th 857, 865.)

10

circumstances would be warranted in the belief that his safety or that of others was in danger." (*Terry, supra,* 392 U.S. at p. 27; see also *United States v. Garcia* (9th Cir.1990) 909 F.2d 389, 391; *People v. Castaneda* (1995) 35 Cal.App.4th 1222, 1230; *People v. Allen* (1975) 50 Cal.App.3d 896, 902.)

" 'The *Terry* case created an exception to the requirement of probable cause, an exception whose "narrow scope" [the United States Supreme Court] "has been careful to maintain." Under that doctrine a law enforcement officer, for his own protection and safety, may conduct a patdown to find weapons that he reasonably believes or suspects are then in the possession of the person he has accosted. [Citation.] Nothing in *Terry* can be understood to allow a generalized "cursory search for weapons" or, indeed, any search whatever for anything but weapons. The "narrow scope" of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked . . . .' " (*People v. Sandoval* (2008) 163 Cal.App.4th 205, 212.)

Officer Panighetti did not testify he thought appellant was armed and dangerous. To the contrary, Officer Panighetti testified that he did not see any bulges or anything in appellant's clothing before he pat searched him, which would have given him a reasonable belief that appellant was armed. Rather, this was a generalized cursory search for weapons, which under *Ybarra v. Illinois* (1979) 444 U.S. 85 (*Ybarra*) cannot be sanctioned.[6]

In the present case, the pat down search of appellant was unlawful under *Terry* and *Ybarra*. The touchstone for justifying a pat down search under *Terry* and *Ybarra* is that the officer must first have a reasonable belief or suspicion that the suspect is engaged in criminal activity and also a reasonable belief or suspicion that he is armed in order to

---

[6]    In *Ybarra,* a pat search was conducted on nine to 13 patrons of a public tavern. The Supreme Court regarded the search as a "generalized 'cursory search for weapons' " (*Ybarra, supra,* 444 U.S. at pp. 93-94); a search that the United States Supreme Court would not sanction. (*Id*. at p. 96.)

11

conduct a pat search. Here, there was no evidence presented that Officer Panighetti had any such reasonable belief or suspicion; in short his testimony at the suppression hearing was bereft of any suggestion that he reasonably believed appellant was engaged in criminal activity or that he reasonably believed that appellant was in fact armed.

In reaching our conclusions in this case, we are mindful that "[t]he judiciary should not lightly second-guess a police officer's decision to perform a patdown search for officer safety. The lives and safety of police officers weigh heavily in the balance of competing Fourth Amendment considerations. [Citations.] However, the *Terry* rule has been extant for over [forty years] and is well known to the police. [Citation.] It is alive and well. [Citation.]" (*People v. Dickey* (1994) 21 Cal.App.4th 952, 957.)

We conclude that the suppression motion was erroneously denied. The error is by its nature prejudicial where, as here, appellant pleaded no contest after the erroneous denial of a suppression motion. (*People v. Ruggles* (1985) 39 Cal.3d 1, 13.) Accordingly, appellant must be allowed, if he so chooses, to withdraw his no contest pleas. Since we must reverse appellant's conviction, it is not necessary to address appellant's other issue regarding the trial court's failure to calculate his presentence custody credits.

12

*Disposition*

The order granting probation is reversed. On remand, the trial court shall enter an order granting appellant's motion to suppress. The trial court is directed to permit appellant to withdraw his guilty plea.

_____
ELIA, J.

WE CONCUR:

_____
RUSHING, P. J.

_____
PREMO, J.

13