Filed 3/20/14  P. v. English CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>                v.<br><br>AQUEELAH ENGLISH,<br><br>        Defendant and Appellant. | F064895<br><br>(Kern Super. Ct. No. BF135310A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Colette M. Humphrey, Judge.

Laurie Wilmore, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and John W. Powell, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Appellant/defendant Aqueelah English turned herself in at the courthouse in Mojave, Kern County, because she had two no-bail misdemeanor warrants for driving

under the influence. The deputies took her into custody and conducted an inventory of her personal property. She had $287 in cash. The cash was placed in a money envelope in her property bag. The deputies maintained custody of the property bag and defendant did not have access to it. A few hours later, the deputies transported her to the Central Receiving Facility (CRF) jail in Bakersfield, and her property bag was given to the receiving deputies. A receiving deputy signed for defendant and her property after she arrived. When the booking deputy later examined defendant's property bag and opened the money envelope, there was only $187 in cash. The senior deputy immediately decided to conduct a "visual body cavity search" of defendant to look for the missing cash – even though defendant never had access to the property bag, and the receiving deputy disavowed having actually received defendant or examined her property bag. The senior deputy told defendant they were going to conduct the strip search, asked if she would "cooperate," and defendant said yes. Defendant removed all her clothes, and two female deputies examined her body without touching her. They saw a plastic bag concealed between her buttocks which contained marijuana, and also recovered an amount of methamphetamine concealed on her body. The missing cash was never found.

Defendant was charged with count I, unauthorized possession of methamphetamine in jail (Pen. Code,[1] § 4573.6), and count II, unauthorized possession of marijuana in jail.

Defendant filed a motion to suppress the evidence and argued the visual body cavity search was unreasonable given the nature of her misdemeanor offenses and the lack of any evidence that she could have taken her own money after it had been counted and placed in the property bag. Defendant also filed a motion pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*), for disclosure of the confidential personnel records of two deputies at the Bakersfield jail: Deputy Warmerdam, who

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

2.

signed as the receiving deputy but later claimed he never received or checked her property; and Deputy Deval, who participated in the search. Defendant requested discovery of any records recording dishonesty.

The superior court found defendant's *Pitchess* motion established good cause to review the confidential records for Deputy Warmerdam but not for Deputy Deval. The court conducted an in camera hearing, reviewed Warmerdam's files, and advised defendant there was no discoverable information. The court then conducted an evidentiary hearing on the validity of the search, found defendant consented to the search when she agreed to "cooperate," and denied the suppression motion. Thereafter, defendant pleaded no contest to count II, unauthorized possession of marijuana in jail, and she was placed on probation.

On appeal, defendant raises several issues, primarily that the court should have granted her suppression motion because the visual body cavity search was unreasonable under the circumstances, and her agreement to "cooperate" did not constitute consent. Defendant also asks this court to review Deputy Warmerdam's confidential personnel records which were before the superior court during the in camera *Pitchess* hearing, and determine whether the court abused its discretion and any records should have been disclosed.

We find the deputies did not have reasonable suspicion to conduct the visual body cavity search, defendant did not voluntarily consent to the search, the suppression motion should have been granted, and the judgment must be reversed. We also address the procedural aspects of the *Pitchess* review because of our concerns about that issue in reference to any future proceedings.

3.

# FACTS[2]

At 7:00 p.m. on January 18, 2011, Deputy Aaron Warmerdam of the Kern County Sheriff's Department was on duty at the CRF in Bakersfield. Warmerdam testified he was responsible for booking inmates into the jail.

Warmerdam testified defendant arrived at the jail that evening. She was already an inmate in custody. She had been booked in Mojave by another deputy, and she was transported to Kern County. She was still wearing her own clothes.

Warmerdam testified that when defendant was taken into custody in Mojave, a deputy counted the money she had on her person and wrote the amount on a form. The money was transported to Kern County in a property bag. When defendant arrived at the Kern County jail, the data entry officer recounted the money in defendant's presence and determined the amount of cash was $100 less than the amount in the report. The data entry officer advised Warmerdam about the discrepancy.[3]

At the preliminary hearing, Warmerdam was asked who recounted the money in Bakersfield. Warmerdam replied: "It was someone from the squad before me, so I do not know. [Defendant] said it was a pretty white deputy. That's how she explained it."

Deputy Warmerdam testified Senior Deputy Burnett and Detention Deputy Deval (female deputies) conducted a "strip search" of defendant to determine if she hid the money on her body.[4] Warmerdam conceded the money had never been given back to

---

[2] There are several different versions of what happened in this case. The following facts are from the preliminary hearing transcript. There was additional evidence about defendant's custodial status contained in her *Pitchess* motion, and introduced during the evidentiary hearing for her suppression motion. We will address these facts below.

[3] As we will explain below, Deputy Warmerdam testified at the suppression hearing about a different sequence of events when defendant arrived at the Bakersfield jail.

[4] The parties alternatively describe the search in this case as both a "visual body cavity search" and a "strip search." As we will discuss in issue I, *post*, section 4030

defendant after she was taken into custody, and the cash had been placed in the property bag in Mojave.

Deputy Warmerdam testified Deputies Burnett and Deval found a white piece of plastic between defendant's buttocks which contained marijuana. They also found a package concealed in her body which contained 0.81 grams of methamphetamine.

On cross-examination, defense counsel asked Deputy Warmerdam if his report about the incident required any corrections. Warmerdam testified he might have mistakenly "switched" the weights of the narcotics found on defendant's body: "I think the methamphetamine says 2.0 grams total package weight and the marijuana says .09 grams total weight."[5]

## PRETRIAL MOTIONS

After the preliminary hearing, defendant filed a *Pitchess* motion for disclosure of the confidential personnel records of Deputies Warmerdam and Deval; and a motion pursuant to section 1538.5 to suppress the narcotics found on her body during the strip search.

**The *Pitchess* Motion**

Defendant's *Pitchess* motion moved for discovery of the confidential personnel records of Deputies Warmerdam and Deval, for complaints of acts or instances of

---

defines a "[v]isual body cavity search" as the "visual inspection of a body cavity." (§ 4030, subd. (d)(2).) At the very least, the visual inspection of an arrestee's naked body, even without a visual examination of body cavities, constitutes a "strip search." (*Edgerly v. City & County of San Francisco* (9th Cir. 2010) 599 F.3d 946, 957 (*Edgerly*); *People v. Lowe* (2013) 221 Cal.App.4th 1276, 1293.)

[5] Deputy Warmerdam later testified at the evidentiary hearing on the suppression motion that he signed as the receiving deputy for defendant, which indicated he examined and confirmed the contents of her property bag, but testified he did not actually receive her when she arrived at the jail, he just signed as the receiving deputy because the actual deputy failed to do so, and he never bothered to find out the identity of the actual receiving deputy. At the preliminary hearing, however, Warmerdam failed to explain these circumstances when asked if he needed to explain any discrepancies.

dishonesty, false arrests, and the fabrication of charges, reports, and/or evidence, to impeach their credibility.

In her supporting declaration, defense counsel stated defendant's money was counted in Mojave and the total was $287. When defendant arrived at the Bakersfield jail, the money was counted again and the total was $287. Defendant was placed in a cell. Defendant later contacted a bond agent and arranged to use $200 of her money to make bail. Deputy Warmerdam escorted defendant from her cell into the cashier's booth for the release of her money. In Warmerdam's presence, the cashier opened a sealed envelope which said it contained $287. The cashier counted the money and the total was $187.

Defense counsel declared Deputy Warmerdam contacted Deputy Deval and other female deputies to conduct a strip search for the missing cash. Defendant refused to consent. Deputy Deval threatened to take defendant to the hospital, strap her down, and humiliate her during a body search. Defendant was searched, the drugs were found, and the money was never recovered.[6]

In the responsive pleadings, the prosecution conceded defendant established good cause for the superior court to conduct an in camera review of Deputy Warmerdam's confidential personnel records. The prosecution opposed review of Deputy Deval's records since she merely conducted the search.

**Suppression motion**

In her suppression motion, defendant argued the deputies' decision to conduct the "visual body cavity search" was unreasonable because it violated section 4030,

---

[6] As we will discuss below, the deputies who testified at the evidentiary hearing on the suppression motion described a different sequence of events leading to the search. Defense counsel's hearsay declaration, which was filed in support of the *Pitchess* motion, was not admitted into evidence during the suppression hearing, and defendant did not testify at that hearing.

subdivision (f), which prohibits strip searches of arrestees held on misdemeanors, except for weapons or controlled substances, unless there is reasonable suspicion the arrestee is concealing contraband. Defendant argued there was no reasonable suspicion that she took the missing cash from the property bag.

In opposition, the People argued the deputies had reasonable suspicion defendant took the missing cash because "due to the busy nature of the inmate receiving facility, the The People asserted defendant had the opportunity to take the money," which constituted contraband in jail.[7] The People did not assert defendant consented or agreed to the search.

## THE PRETRIAL HEARINGS

### *Pitchess* hearing

On February 16, 2012, the court conducted a hearing on defendant's *Pitchess* motion. The court advised the parties it found good cause to conduct an in camera review of Deputy Warmerdam's personnel records for any allegations of dishonesty, but concluded defendant failed to establish good cause for review of Deputy Deval's records.

After the in camera hearing, the court returned on the record, advised the parties it reviewed Deputy Warmerdam's records, and found there was no discoverable information.

## THE SUPPRESSION MOTION

After the court denied the *Pitchess* motion, it conducted an evidentiary hearing on defendant's suppression motion and her contentions the officers lacked reasonable suspicion to conduct the visual body cavity search. Several deputies testified generally

---

[7] As we will discuss below, there was no evidence introduced at the suppression hearing which showed defendant had the opportunity to take her money once it was placed in the property bag in Mojave.

7.

about the booking, transportation and search procedures, and about the events which led to the search of defendant.

**Defendant's arrival in Mojave**

Deputies Megan Hudson and Brenda Waidleich, who were assigned to the Mojave courthouse, testified defendant checked in at the Mojave counter with two no-bail misdemeanor warrants for driving under the influence (DUI). It was already past the cut-off time to add matters to the Mojave court calendar. Deputy Hudson advised defendant she would be taken into custody because of the no-bail warrants.

Deputy Hudson testified she took defendant to the jail located in the back of the Mojave courthouse, where inmates are temporarily housed for court hearings. Hudson "handed her off" to Deputies Waidleich and James Clepacki, the detention deputies. Hudson testified defendant was going to be transported to the Bakersfield jail because it was too late to appear in the Mojave court. Hudson did not search defendant or check any of her property, and left that to the detention deputies.

Deputy Waidleich testified she searched defendant in Mojave. Waidleich removed defendant's property from her pockets and counted her cash. Waidleich testified defendant was upset about her money being taken from her.

> "[Defendant] wanted to count her money in front of me. I never let people count their own money; this day I did. [¶] *[Defendant] counted it, she gave it back to me, I recounted it, I asked her what she got and she told me 287 dollars, and I said that's exactly what I got. Put it in the envelope*." (Italics added.)

Waidleich testified she put defendant's cash in a small money envelope and wrote the total amount on the envelope and on the field arrest data report.[8]

---

[8] Deputy Waidleich testified that at some later time, she was repeatedly asked by the sergeant in Mojave about how much money defendant had. Waidleich told the sergeant that she could not remember, but thought it was "two hundred and eighty-something maybe."

8.

Deputy Waidleich testified defendant and other inmates were transported from Mojave to the Bakersfield jail in a bus. Defendant was still in custody. Defendant's property bag was not given to her. Instead, the transportation deputies had the property bag, and they gave it to the receiving deputies when they arrived in Bakersfield.

**Defendant arrives at the Bakersfield jail**

Deputy Aaron Warmerdam, who was assigned to the Bakersfield jail, testified generally that when an inmate is transported to the jail, the transportation deputies will escort the inmate to the receiving center counter. At that location, a deputy will ask medical screening questions, and recheck the field arrest data report to note the charges against the inmate and the inmate's arrival time. The inmate's property would be checked, and any cash would be counted to ensure the information on the field data arrest form was correct.

Deputy Melissa Hunter, a shift supervisor for the jail's clerical staff, similarly testified that when an inmate is transported to the Bakersfield jail, the transportation deputies will bring the inmate's property bag from the prior facility and give it to the jail's receiving deputies.

Senior Deputy Katherine Burnett testified that when defendant arrived at the Bakersfield jail from Mojave, a deputy at the receiving counter would have searched defendant, her clothing, pockets, socks, and shoes.

**Deputy Warmerdam signs defendant's field arrest report**

Deputy Warmerdam testified he went on duty at 7:00 p.m. on the evening that defendant arrived at the Bakersfield jail. By the time Warmerdam started his shift, defendant had already arrived from Mojave and had been booked into the jail. Warmerdam thought she might have arrived around 6:30 p.m.

Warmerdam testified he did not receive or process defendant when she arrived. However, Warmerdam testified he signed his name on defendant's field arrest data report

9.

and declared he was the deputy who received defendant at the jail. Warmerdam explained why he did signed for defendant:

> "Because earlier … I received another call that there was [a field arrest data report] that wasn't signed from the people, from Mojave, the transfer from Mojave and it must be signed, and the date and time must be indicated on the [field arrest data] before they can be entered into [the computer system]."

Deputy Warmerdam testified that even though he signed for defendant as the receiving deputy, he did not check defendant's property bag to determine whether the contents were consistent with the report on the property envelope and the field arrest data report. Warmerdam testified defendant's field arrest data report stated there was $287 in her property bag. Warmerdam did not confirm that amount was present in the property bag, even though he signed the field arrest report which declared he received her with that amount of money.

## Deputy Hunter meets defendant in the control booth

Deputy Hunter testified her duties included being in control of the inmates' property bags at the Bakersfield jail. Hunter explained how property is processed at the jail:

> "If we're booking inmates, then the deputies will slide the property bags down to us and we will book the inmates with the information that they have given to us. *The property bags are sealed, but money envelopes will be on the outside of the bags, where we can access it and count it and put it into our money drawer.* And then once the property bags to go the office, then we just take them numerically and transfer them from facility to facility." (Italics added.)

Deputy Hunter testified that when she books an inmate, she counts the money in front of the inmate, adds the amount to the inmate's commissary account, and puts the cash into the money drawer.

10.

Deputy Hunter testified about what she believed happened when defendant arrived at the Bakersfield jail from Mojave. Hunter believed the Mojave transportation deputies gave defendant's property bag to the receiving deputies in Bakersfield.

> "Well, [defendant] was received *by a receiving officer* and then she was probably put into a holding cell, and *then after the holding cell, then they come into our booking booth.* Then at that point in time we already have her property bag which has her money envelope *inside of it*, and then I would have taken it out…." (Italics added.)

Deputy Hunter believed the receiving deputies gave defendant's property bag to Hunter. Hunter testified defendant did not have the property bag, and she did not give it to Hunter.

Deputy Hunter testified her first contact with defendant occurred about an hour after defendant arrived at the jail. Defendant was already sitting in the data entry officer's booth. The booth was one of three separately enclosed and locked booths where deputies book inmates. Hunter testified each booth was about 6 feet by 20 feet. Hunter did not know which receiving officer escorted defendant into the booth.

Deputy Warmerdam testified he did not escort defendant into the data entry officer's booth, and he did not know which deputy provided the escort.

Deputy Hunter testified there was a glass partition in the booth which separated defendant from Hunter. Each side of the booth could only be entered with a deputy's key. There was a countertop on both sides of the glass partition. The glass partition was two feet by three feet, and did not completely reach the top of the ceiling. There was a small slot-like opening at the bottom of the glass partition. The slot was just large enough to slide a receipt and pen from the deputy's side to the inmate to sign for the property. The slot was normally locked on the deputy's side of the booth.

11.

Deputy Hunter believed that when she met with defendant, she was going to be released, based on comments defendant made about getting back to Lancaster. Hunter did not know if defendant was trying to arrange for bail.**9**

**Deputy Hunter discovers the cash discrepancy**

Deputy Hunter testified she processed defendant just like she would do for any other inmate. Hunter received the field arrest data report, which stated that defendant had $287 when she was booked in Mojave. There was a money envelope in the property bag, and it also said defendant had $287 when she was booked in Mojave.

Deputy Hunter testified she took the money envelope out of the property bag and counted the cash. There was only $187, which was $100 less than listed on the form. Defendant was sitting on the other side of the glass partition when Hunter counted the cash and discovered the discrepancy. Hunter could not recall if the slot through the glass was open or closed when she counted the cash.

Deputy Hunter testified that when she realized the money was missing, she immediately searched her side of the control booth, and moved other property bags around to see if something had fallen out, and she did not see anything. Defendant kept asking what was going on with her money. Hunter told defendant they were checking on it. Defendant remained in the enclosed booth in front of Hunter for "quite awhile," and repeatedly asked where was her money, and when was she going to be done. Deputy Hunter did not search defendant.

---

**9** Defendant did not testify at the suppression hearing. Defense counsel's *Pitchess* declaration stated that defendant contacted a bail bond company while in the holding cell; she arranged to make bail for $200; the bail bond agent was on his way to the jail; and defendant was taken into the data entry control booth for the release of her money to pay the bail bond agent. These facts were not introduced at the suppression hearing.

12.

**Deputy Warmerdam's first contact with defendant**

After Deputy Hunter searched the area, she called "the receiving officer," who was identified as Deputy Warmerdam.

Deputy Warmerdam testified that at 10:00 p.m., he received a call from Deputy Hunter that $100 was missing from defendant's money envelope. Warmerdam testified his first contact with defendant occurred after that call. Defendant was still in the data entry officer's booth. Warmerdam did not know if defendant was trying to arrange for bail.

Deputy Warmerdam testified that when he arrived at the booth, he counted the cash in defendant's money envelope and there was $187, even though the envelope said there was $287 inside.

Deputy Warmerdam testified he called Senior Deputy Burnett and told her about the discrepancy. As they waited for Burnett to arrive at the booth, Warmerdam asked defendant how much money she had when she was originally booked in Mojave. Defendant said she had $287. Warmerdam did not search defendant.

Deputy Warmerdam testified that he had signed for defendant's arrival at the jail as the receiving officer, but he did not receive defendant, and he never investigated who actually received defendant and her property bag when she arrived from Mojave.

**Senior Deputy Burnett decides to search defendant**

Senior Deputy Burnett testified Deputy Warmerdam called and advised her that $100 was missing from defendant's property bag. Burnett's first contact with defendant occurred while defendant was still in the control booth. Warmerdam was present.

Deputy Burnett testified she spoke to Deputy Hunter, who explained the discrepancy. Burnett confirmed the notations on the money envelope, counted the cash, and agreed there was only $187.

Deputy Burnett instructed Hunter to book defendant with the actual amount of cash that was in the bag, and "we would … attempt to figure out what happened, and

13.

correct it if we could, if we could find the money or whatever, but we would have to work on getting an answer to it, how come there was a discrepancy on the money."

**Deputy Burnett's testimony about the timing of the search**

Deputy Burnett initially testified that after the discrepancy was discovered, the deputies searched all the inmates in the female holding area, and Burnett searched Deputies Hunter and Miller, the control booth officers. The money was not found.

Deputy Burnett testified that after these searches were unsuccessful, she decided to conduct a visual body cavity search of defendant to look for the money. Burnett conceded that no one reported to her that defendant had taken the money from the property bag. Burnett explained the reason she decided to search defendant:

> "It wouldn't have been the first time that an inmate saw an opportunity to grab money, be it their own or someone else's.… [¶] [¶] Everyone knows that if something comes up missing out of our custody, the County is going to replace it. And we have had instances where someone, an inmate, we've actually found property and/or money belonging either to them or someone else, in past instances."

On cross-examination, however, Burnett consulted her report and clarified the timing of the strip search. Burnett conceded that she searched defendant *before* she conducted the other searches. Burnett further clarified that after she searched defendant, found the drugs, and did not find the cash, she then searched the control booth deputies and the other inmates, and still did not find the money.[10]

**Deputy Burnett's testimony about defendant's "cooperation"**

Deputy Warmerdam testified he escorted defendant to the female "deck" area because Senior Deputy Burnett was going to conduct a strip search to look for the

---

**10** Deputy Hunter confirmed that Deputy Burnett searched Deputy Miller and herself for the missing cash, and the money was not found. Hunter thought defendant was still in the control booth when Burnett searched them.

missing cash. No other deputy had contact with defendant when Warmerdam escorted her from the control booth to Deputy Burnett's area.

Deputy Burnett testified the deputies followed the department's protocol and filled out a form to request to conduct a "visual body cavity search" of defendant to look for the missing cash. Burnett was not sure if the form was completed by Deputy Deval or herself.[11]

Defense counsel asked Deputy Burnett whether she told defendant it would be easier if she agreed to the visual body cavity search, because otherwise defendant would be taken to the hospital and placed naked on a gurney, where everyone could see her. Burnett said no and explained:

> "I believe that's out of context. [Defendant] actually agreed to the search. When I told her that *we wanted to do a visual body cavity search*, and I specifically, and I do it every time, *I ask them are you going to cooperate with that, and [defendant] said yes*." (Italics added.)[12]

Deputies Burnett and Deval conducted the strip search. Burnett testified they found a small amount of marijuana concealed between defendant's buttocks. Burnett testified that once they found the marijuana, she "knew" something else was there. Burnett testified she told defendant she would obtain a search warrant "to get it if that's what it took, and I would take her to [the hospital] and I would have a doctor remove

---

[11] This form was attached as an exhibit to defendant's *Pitchess* motion, but stated that Deputy Warmerdam, again identified as the receiving deputy, requested to conduct the strip search for the missing cash, and Senior Deputy Burnett granted the request.

[12] Deputy Burnett's report about the search was included as an exhibit to defendant's *Pitchess* motion, but the hearsay statements were not introduced at the suppression hearing. In her report, Burnett describes her interaction with defendant: "Prior to searching [defendant], I explained to her what we were doing and why. I told her if she had the money, she could give it to me and avoid any further trouble. She said she did not have any money on her person, and would not steal money from herself. She agreed to submit to the search."

it ….'' Burnett never said defendant would be placed on a gurney. The officers also found a small amount of methamphetamine hidden in another part of defendant's body.[13]

**The court's denial of the suppression motion**

The court denied the suppression motion and found defendant consented to the visual body cavity search:

> "It's apparent to me that the parties involved were actually legitimately searching for the money. They didn't just search [defendant], they also searched all the other inmates that were in the holding cell at the time. They also searched the other employees that were nearby. So they weren't just focusing on [defendant].
>
> "With regard to the actual strip search, *Deputy Burnett testified that [defendant] consented to the search* and then after they found the marijuana, apparently she became somewhat resistant, and at that point Deputy Burnett said I'll get a warrant if I have to, and apparently at that point [defendant] cooperated. So, I don't think there was any Fourth Amendment violation. I don't know if there was a violation of some other sheriff's protocol .… But in terms of a Fourth Amendment violation, I don't see it in this situation, so I am going to deny the motion." (Italics added.)

The court did not address whether the deputies needed or had reasonable suspicion to conduct the search.

---

[13] At the evidentiary hearing, Deputy Burnett simply testified they also found methamphetamine hidden in defendant's body. Neither the prosecutor nor defense counsel asked Burnett further details about how they found the second amount of drugs Defendant attached Deputy Burnett's investigative report about the search as an exhibit to her *Pitchess* motion. According to Burnett's report, after they found the marijuana on her body, Deputy Deval instructed defendant to squat down, cough, and perform other maneuvers in order conduct a more thorough search of her body. Ultimately, Burnett told defendant that if she did not remove it, they would obtain a search warrant, take her to the hospital, and have a doctor remove it. After hesitating for several minutes, defendant produced a small amount of methamphetamine. This version of the second part of the search was not introduced at the suppression hearing.

16.

**Plea and sentence**

Thereafter, defendant pleaded no contest to count II, unauthorized possession of marijuana in jail, which was based on the first amount of drugs found on her body; and to two unrelated misdemeanor offenses. The court dismissed count I, unauthorized possession of methamphetamine in jail, which had been based on the second amount of drugs found in her body. The court also dismissed another unrelated charge. She was placed on probation for three years for count II, subject to certain terms and conditions, including serving 176 days in jail.

## DISCUSSION

### I.  The deputies did not have reasonable suspicion to conduct the search

Defendant contends her suppression motion should have been granted because the visual body cavity search was unconstitutional and violated her due process rights. Defendant asserts the search violated section 4030, which regulates custodial strip searches; the deputies needed reasonable suspicion to conduct the search since she was being detained for nonviolent and minor offenses; and they lacked any reasonable suspicion she took her money from the property bag.

#### A. Standard of review

On appeal from the denial of a suppression motion, this court upholds any factual findings, express or implied, that are supported by substantial evidence, but we independently determine, as a matter of law, whether the challenged search conforms to constitutional standards of reasonableness. (*People v. Hughes* (2002) 27 Cal.4th 287, 327 (*Hughes*).)

#### B. Section 4030

We begin with defendant's contention (repeatedly raised before the superior court) that the deputies violated section 4030, subdivision (f) when they conducted the visual body cavity search. This section states in relevant part:

"No person arrested and held in custody *on a misdemeanor or infraction offense*, except those involving weapons, controlled substances or violence … shall be subjected to *a strip search or visual body cavity search prior to placement in the general jail population*, unless a peace officer has determined there is *reasonable suspicion* based on specific and articulable facts to believe such person is concealing a weapon or contraband, and a strip search will result in the discovery of the weapon or contraband.  No strip search or visual body cavity search or both may be conducted without the prior written authorization of the supervising officer on duty.  The authorization shall include the specific and articulable facts and circumstances upon which the reasonable suspicion determination was made by the supervisor."  (§ 4030, subd. (f), italics added.)

Section 4030 was enacted "to protect the state and federal constitutional rights of the people of California by establishing a statewide policy strictly limiting strip and body cavity searches."  (§ 4030, subd. (a).)  It provides for civil and criminal remedies upon violations of its terms.  (§ 4030, subds. (n) & (p).)[14]

Despite these provisions, however, section 4030 does not state the basis for an exclusionary rule or a violation of the Fourth Amendment.  Instead, evidence found during a visual body cavity search is subject to suppression only if it is the product of a search conducted in violation of the United States Constitution.  (*People v. McKay* (2002) 27 Cal.4th 601, 609-610; *People v. Wade* (1989) 208 Cal.App.3d 304, 307-309.)

## C. *Florence* **and custodial detainees**

We thus turn to the constitutional standards to conduct visual body cavity searches.  In *Bell v. Wolfish* (1979) 441 U.S. 520, the United States Supreme Court held that strip and visual body cavity searches may, in certain instances, be conducted on

---

**14** Based on the exhibits submitted with defendant's *Pitchess* motion, it appears the deputies complied with section 4030, subdivision (f)'s requirement for written authorization – Deputy Warmerdam filled out the form and officially requested to conduct the search, and Deputy Burnett signed the form to give her approval.  These documents were not introduced into evidence at the suppression hearing.  As noted above, however, Burnett testified at the suppression hearing that *she* made the decision to conduct the search, and she was not sure if the form was completed by Deputy Deval or herself.

prisoners and pretrial detainees in institutional settings with less than probable cause. (*Id.* at p. 561.) To determine whether an institutional search policy is reasonable under the Fourth Amendment, the court must balance "the need for the particular search against the invasion of personal rights that the search entails…." (*Id.* at p. 559.)

In *Florence v. Board of Chosen Freeholders* (2012) ___ U.S. ___ [132 S.Ct. 1510], the court held law enforcement officers do not need reasonable suspicion to conduct strip searches of pretrial detainees who enter the general population in a jail or prison, even if they have been arrested for nonviolent or minor offenses. (*Id.* at pp. 1522–1523.) "[T]he seriousness of an offense is a poor predictor of who has contraband …," and "[p]eople detained for minor offenses can turn out to be the most devious and dangerous criminals. [Citations.]" (*Id.* at p. 1520.) "There is a substantial interest in preventing any new inmate, either of his own will or as a result of coercion, from putting all who live or work at these institutions at even greater risk *when he is admitted to the general population*." (*Ibid.*, italics added.)

*Florence* held the key question is not whether the detainee has been charged with a minor, nonviolent offense, but whether the detainee has been classified for housing in the custodial facility's general population at the time of the strip search. The court concluded that requiring individualized suspicion would undermine the ability of custodial officers to maintain the security of the facility. (*Florence*, *supra*, 132 S.Ct. at pp. 1522–1523; see also *Bull v. City and County of San Francisco* (2010) 595 F.3d 964, 981–982 (*Bull*); *Edgerly*, *supra*, 599 F.3d at p. 957.)[15]

---

[15] It is well-settled that prisoners already in general population are validly subject to "visual body cavity searches" after engaging in "certain activities such as a visit to the law library, infirmary, or exercise room or an encounter with an outsider *irrespective of whether the prison officials entertained a reasonable suspicion the prisoners had concealed contraband on their persons*[,]" based on "the legitimate penological need to prevent drugs and weapons from being introduced into or transported throughout a prison and the relative lack of intrusiveness involved in the search,…" (*People v. Collins* (2004) 115 Cal.App.4th 137, 154, italics in original.)

However, the majority opinion in *Florence* clarified it was not addressing "the types of searches that would be reasonable in instances where, for example, a detainee will be held *without assignment to the general jail population and without substantial contact with other detainees*…." (*Florence, supra*, 132 S.Ct. at pp. 1522–1523, italics added.) As an example, *Florence* cited *Atwater v. Lago Vista* (2001) 532 U.S. 318, 324, where officers took the arrestee's " ' "mug shot" ' and placed her, alone, in a jail cell for about one hour, after which she was taken before a magistrate and released on $310 bond.' " (*Florence*, *supra*, 132 S.Ct. at p. 1523.) *Florence* noted "[t]he accommodations provided in these situations may diminish the need to conduct some aspects of the searches at issue. [Citation.]" (*Ibid*.)

*Florence* thus did not disturb a series of federal circuit cases which have consistently held that prison officials must have individualized reasonable suspicion to conduct strip searches of "arrestees charged with minor offenses *who are not classified for housing in the general jail population*. [Citation.]" (*Edgerly*, *supra*, 599 F.3d at p. 957, italics added; *Bull*, *supra*, 595 F.3d at pp. 972–973.)

### D. Analysis

Defendant argues the strip search was unconstitutional because the deputies lacked reasonable suspicion as required by section 4030, since she was being held for nonviolent misdemeanor offenses. As we have explained, however, section 4030 does not state an exclusionary rule, and evidence seized during a strip search may be excluded only if the search violated the Fourth Amendment. (*People v. McKay, supra,* 27 Cal.4th at pp. 609–610; *People v. Wade, supra,* 208 Cal.App.3d at pp. 307–309.)

Instead, the reasonableness of this search is dependent on *Florence*, which held that custodial officials may conduct strip searches of detainees, even if they are being held for nonviolent and minor offenses, if the detainees are being housed in the general population of a jail or prison. In this case, however, there is no evidence defendant was being placed in any type of general population. Defendant turned herself in at the

20.

Mojave courthouse for misdemeanor no-bail warrants for driving under the influence. She remained in her own clothes during the entirety of the incident. She was taken to Bakersfield because she had arrived too late to have her matter placed on the Mojave court calendar. There is no evidence she was moved to the Bakersfield jail to be placed in the general population.

In addition, there is no evidence defendant was going to be placed in the jail's general population once she arrived in Bakersfield. Deputy Hunter testified about her interaction with defendant in the control booth, and that defendant's statements indicated she was going to be released. The record suggests defendant was in a holding cell between her arrival in Bakersfield and the strip search, based on Deputy Burnett's testimony that she later searched other female inmates who had been in the holding cell with defendant.

*Florence's* standard for strip searches would not apply in this case given the lack of evidence that defendant was going to be placed, or was already housed, in the jail's general population. Thus, the deputies' decision to conduct the strip search required individualized, reasonable suspicion that defendant had taken her own money at some point between Mojave, where Deputy Waidleich counted the cash and placed it in the money envelope, and the control booth in Bakersfield, where Deputy Hunter opened the property bag and discovered that $100 was missing.

Reasonable suspicion is a lesser standard than probable cause, but "to be reasonable, the officer's suspicion must be supported by some specific, articulable facts that are 'reasonably "consistent with criminal activity." ' [Citation.] The officer's subjective suspicion must be objectively reasonable," and cannot be " 'predicated on mere curiosity, rumor, or hunch … even though the officer may be acting in complete good faith. [Citation.]' [Citation.]" (*People v. Wells* (2006) 38 Cal.4th 1078, 1083.)

At the evidentiary hearing, Deputy Burnett testified she decided to conduct the strip search because "[i]t wouldn't have been the first time that an inmate saw an

21.

opportunity to grab money, be it their own or someone else's.… [¶] … [¶] Everyone knows that if something comes up missing out of our custody, the County is going to replace it. And we have had instances where someone, an inmate, we've actually found property and/or money belonging either to them or someone else, in past instances."

Deputy Burnett's stated justification was obviously based on her experience in the jail. Based on *Florence* and other circuit cases, however, *individualized* reasonable suspicion is required to conduct a strip search of an arrestee for a minor, nonviolent offense who was not being placed in general population. There was no evidence that defendant had access to her money after Deputy Waidleich seized her property in Mojave. The only possible evidence that defendant could have taken her own money could be based on Waidleich's testimony that she allowed defendant to initially count her money when they were in Mojave, and defendant counted $287. However, Waidleich further testified that defendant then handed the cash to Waidleich, Waidleich counted it herself, and she also counted $287. Waidleich testified she placed $287 in the money envelope attached to defendant's property bag, and wrote the amount on the relevant documents.

The prosecution did not introduce any evidence that Burnett knew about the manner in which Waidleich conducted the search in Mojave.[16] More importantly, there is no evidence defendant had access or control of the property bag after that point. Instead, the transportation deputies who escorted defendant from Mojave gave her property bag to the receiving deputy in Bakersfield. At that time, the receiving deputy

---

[16] In her incident report, Burnett stated her belief that defendant might have been able to "pick up the money off of the counter without being noticed" because they were busy during the shift change "when the Mojave remands were brought in" to Bakersfield. Neither Burnett nor any other deputy testified to this belief at the evidentiary hearing. Moreover, there was no evidence that defendant had access to the property bag when she arrived at the jail. Instead, Burnett simply testified she believed defendant took the money to obtain reimbursement from the county.

was supposed to sign for defendant and attest that he/she confirmed the contents of the property bag and counted the cash in the money envelope. Deputy Warmerdam signed as the receiving deputy. Deputy Hunter testified to her belief that Warmerdam was the receiving deputy who would have given the property bag to her.

However, Warmerdam disavowed his status as receiving deputy and testified he merely signed to correct a clerical error, since the actual receiving deputy failed to do so. Warmerdam also testified he never checked defendant's property bag or the money envelope prior to the discovery that defendant's money was missing. He never tried to discover the actual identity of the receiving deputy who purportedly failed to sign for defendant's arrival in Bakersfield.

Deputy Hunter testified she opened the property bag and money envelope after defendant had been placed on the other side of the glass partition in the control booth. There was only a small opening in the glass between the booth's two sides, and it was supposed to be kept locked on the deputy's side. Hunter never testified the small opening was unlocked, that defendant reached through it, that she had the opportunity to do so, or that she could have reached the property bag and money envelope at any time she was in the control booth.

Given these circumstances, there is no evidence to support the reasonable suspicion that defendant could have removed the cash after her belongings were seized and inventoried in Mojave, placed in the property bag, and delivered to the deputies in Bakersfield. Defendant remained in custody for the entire period. There is no evidence she had access to the property bag, or she could have or tried to reach for the money envelope when she was sitting in the control booth.

Despite the absence of any reasonable suspicion that defendant took the money, Deputy Burnett's immediate decision was to conduct the strip search. Based on the testimony at the suppression hearing, Burnett made this decision even before she searched other inmates in the holding cell, or any deputies who had access to the property

23.

bag. She also made the decision before she traced the path taken by the property bag and money envelope, which would have revealed Deputy Warmerdam's admission that he falsely signed as the receiving deputy who confirmed the contents of the property bag. In addition, Burnett testified she decided to conduct the strip search of defendant solely because of her general belief that custodial inmates will likely steal their own money to file false claims against the county. At the evidentiary hearing, Burnett never testified that she (or any other deputy) had an individualized suspicion that defendant could have taken her money, and any such suspicion would not have been reasonable based on the record presented to this court.

We thus conclude the deputies were required to have reasonable suspicion to conduct the strip search because there is no evidence defendant was going to be placed in general population, and there is no evidence to support any type of reasonable suspicion that she could have taken her own money.

## II.     Defendant's agreement to cooperate

In ruling on defendant's suppression motion, the superior court did not address defendant's argument about whether there was reasonable suspicion to support the search. Instead, the court found the deputies acted in good faith and defendant consented to the search when she agreed to cooperate. Defendant now contends there is no evidence to support the court's conclusion that she consented to the strip search. We agree.

### A. Consent

"It has been long recognized that police officers, possessing neither reasonable suspicion nor probable cause, may nonetheless search an individual without a warrant so long as they first obtain the voluntary consent of the individual in question. [Citation.]" (*United States v. Blake* (11th Cir. 1989) 888 F.2d 795, 798; *People v. Jenkins* (2000) 22 Cal.4th 900, 971.)

24.

"The voluntariness of consent is a question of fact to be determined from the totality of circumstances. [Citations.] If the validity of a consent is challenged, the prosecution must prove it was freely and voluntarily given – i.e., 'that it was [not] coerced by threats or force, or granted only in submission to a claim of lawful authority.' [Citations.]" (*People v. Boyer* (2006) 38 Cal.4th 412, 445-446, first brackets in original.) "The absence of official coercion is a *sine qua non* of effective consent, as it is axiomatic that 'where there is coercion, there cannot be consent.' [Citations.]" (*United States v. Gonzalez* (11th Cir. 1996) 71 F.3d 819, 828, citing *Bumper v. North Carolina* (1968) 391 U.S. 543, 550; *Florida v. Bostick* (1991) 501 U.S. 429, 438.)

A defendant's consent to search may be express or implied, and may be demonstrated by conduct as well as words. (*People v. Superior Court* (*Chapman*) (2012) 204 Cal.App.4th 1004, 1012.) " 'The existence of consent to a search is not lightly to be inferred,' [citation], and the government 'always bears the burden of proof to establish the existence of effective consent.' [Citations.]" (*United States v. Shaibu* (9th Cir. 1990) 920 F.2d 1423, 1426.)

The court must determine whether the officer's belief that defendant consented to the search is objectively reasonable under the circumstances. (*People v. Lazalde* (2004) 120 Cal.App.4th 858, 865.) "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness – *what would the typical reasonable person have understood by the exchange between the officer and the suspect*? [Citations.]" (*Florida v. Jimeno* (1991) 500 U.S. 248, 251, italics added; *People v. Crenshaw* (1992) 9 Cal.App.4th 1403, 1408.)

In asking for consent to search, officers are not required to advise the suspect of the right to refuse consent. (*United States v. Drayton* (2002) 536 U.S. 194, 206–207.) " 'The mere asking of permission to … make a search carries with it the implication that the person can withhold permission for such an entry or search.' [Citations.]" (*People v. James* (1977) 19 Cal.3d 99, 116.)

**B. <u>Analysis</u>**

While we must defer to the trial court's factual findings when supported by substantial evidence, there are no disputed facts about the exchange between Deputy Burnett and defendant regarding their conversation about "cooperation." Deputy Burnett was the only witness who testified about this conversation, and defendant did not testify or offer a different version of events.[17] Thus, the issue of whether this exchange constituted defendant's voluntary consent to a visual body cavity search raises a question of law subject to our independent review.

However, defendant was never asked if she would "consent" to the visual body cavity search. Instead, Deputy Warmerdam escorted defendant from the control booth to a private deck area, where she was met by Deputies Burnett and Deval. Deputy Burnett asked defendant a different question:

> "When I told her that *we wanted to do a visual body cavity search*, and I specifically, and I do it every time, *I ask them are you going to cooperate with that, and [defendant] said yes*." (Italics added.)

It is important to recognize exactly what defendant was being asked to "cooperate" with. As discussed *ante*, the parties and testifying witnesses alternatively described the search in this case as a "visual body cavity search" and a "strip search." Section 4030 defines a " '[v]isual body cavity search' " as the "visual inspection of a body cavity," and a " '[p]hysical body cavity search' " as the "physical intrusion into a body cavity for the purpose of discovering any object concealed in the body cavity." (§ 4030, subds. (d)(2), (d)(3).)

The United States Supreme Court has observed that the term "strip search" is "… imprecise. It may refer simply to the instruction to remove clothing while an officer

---

[17] A slightly different version of this conversation was set forth in defense counsel's declaration in support of the *Pitchess* motion, but this hearsay declaration was not before the court at the suppression hearing.

26.

observes from a distance of, say, five feet or more; it may mean a visual inspection from a closer, more uncomfortable distance; it may include directing detainees to shake their heads or to run their hands through their hair to dislodge what might be hidden there; or it may involve instructions to raise arms, to display foot insteps, to expose the back of the ears, to move or spread the buttocks or genital areas, or to cough in a squatting position….” (*Florence*, *supra*, 132 S.Ct. at p. 1515.)  The visual inspection of an arrestee’s naked body, even without a visual examination of body cavities, constitutes a “strip search.” (*Edgerly*, *supra*, 599 F.3d at p. 957; *People v. Lowe*, *supra*, 221 Cal.App.4th at p. 1293.)

As we have explained, “[t]he standard for measuring the scope of a suspect’s consent under the Fourth Amendment is that of ‘objective’ reasonableness – *what would the typical reasonable person have understood by the exchange between the officer and the suspect*?  [Citations.]” (*Florida v. Jimeno, supra*, 500 U.S. at p. 251, italics added.) A stated desire to cooperate, standing alone, may be insufficient to constitute consent. (*Honeycutt v. Aetna Ins. Co.* (7th Cir. 1975) 510 F.2d 340, 344; cf., *People v. Jenkins*, *supra*, 22 Cal.4th at p. 973.)  “Under some very limited circumstances,… courts will infer consent from the cooperative attitude of a defendant.  [Citations.]”  (*United States v. Impink* (1984) 728 F.2d 1228, 1232.)  Officers may reasonably rely on a suspect’s apparent consent in situations where the suspect “ ‘ “deliberately chose a stance of eager cooperation in the hopes of persuading the police of his innocence” ’ [citation.]” and was “unfailingly cooperative and remained eager to prove his veracity .…”  (*Ford v. Superior Court* (2001) 91 Cal.App.4th 112, 128.)

As we have also explained, however, “the absence of official coercion is a *sine qua non* of effective consent, as it is axiomatic that ‘where there is coercion, there cannot be consent.’  [Citations.]” (*United States v. Gonzalez, supra,* 71 F.3d at p. 828, citing *Bumper v. North Carolina, supra,* 391 U.S. at p. 550; *Florida v. Bostick, supra,* 501 U.S. at p. 438.)  Thus, consent is not voluntary when given in acquiescence to a claim of

lawful authority. (*Bumper v. North Carolina*, *supra*, 391 U.S. at pp. 548–549; *Florida v. Royer* (1983) 460 U.S. 491, 497; *People v. Boyer*, *supra*, 38 Cal.4th at pp. 445–446.)

Defendant was not asked if she would consent to a strip search. Instead, Deputy Burnett flatly told defendant the deputies were going to conduct the visual body cavity search to look for her missing money. Burnett never gave defendant the option to agree or disagree with what was about to happen. Burnett's inquiry about whether defendant was going to "cooperate" was not the equivalent of asking for her consent or agreement to be searched in that manner. A typical reasonable person would have understood Deputy Burnett's statements to mean that they were going to conduct the strip search regardless of defendant's consent, and Burnett was trying to determine whether defendant was going to cooperate or comply with their orders to remove her clothing and follow their directives, or whether she would resist the strip search. When defendant said, "yes" to Burnett's question, the plain meaning of the response under the circumstances was that she would cooperate and would not resist the deputies' performance of the strip search.

We thus conclude that, as a matter of law, the undisputed facts establish that defendant was not asked for and did not give her consent to be subject to a visual body cavity search. Given the absence of both reasonable suspicion to conduct the search, and any actual or reasonably inferable consent, we also conclude defendant's motion to suppress the narcotics found during the illegal visual body search should have been granted, and defendant's conviction based on her no contest plea to unauthorized possession of marijuana in jail must be reversed.

## III.    **Defendant's *Pitchess* motion**

While our resolution of the suppression motion will result in the reversal of defendant's conviction, we find it important to address an additional issue regarding defendant's *Pitchess* motion. As we will explain, we are concerned about the manner in which the custodian of records responded to the superior court's directive to produce certain confidential personnel records at the in camera *Pitchess* hearing.

28.

## A. *Pitchess* motions

We begin with the well-settled standards for the *Pitchess* discovery procedure, which has two steps.  First, the moving party must file a written motion describing the type of records sought, supported by " '[a]ffidavits showing good cause for the discovery or disclosure sought, setting forth the materiality thereof to the subject matter involved in the pending litigation and stating upon reasonable belief that the governmental agency identified has the records or information from the records.' "  (Evid.Code, § 1043, subd. (b)(3); *People v. Mooc* (2001) 26 Cal.4th 1216, 1226 (*Mooc*).)

Once the superior court finds good cause, it must conduct an in camera review of the pertinent documents to determine which, if any, are relevant to the case, typically disclosing only identifying information concerning those who filed complaints against the officers.  (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1019.)  "The trial court may not disclose complaints more than five years old, the 'conclusions of any officer' who investigates a citizen complaint of police misconduct, or facts 'so remote as to make [their] disclosure of little or no practical benefit.'  [Citations.]"  (*Ibid.,* first brackets in original.)  Even upon a showing of good cause, the defendant is only entitled to information that the court, after the in camera review, concludes is relevant to the case.  (*People v. Johnson* (2004) 118 Cal.App.4th 292, 300.)

When the superior court conducts the in camera review, it must make a record that will permit future appellate review.  (*Mooc, supra,* 26 Cal.4th at pp. 1229–1230; *People v. Guevara* (2007) 148 Cal.App.4th 62, 69.)  The court may do so by either copying the documents and placing them in a confidential file, preparing a sealed list of the documents it reviewed, or "simply state for the record what documents it examined[]" and seal that transcript.  (*Mooc, supra,* 26 Cal.4th at pp. 1229–1230.)

The trial court has broad discretion in ruling on both the good cause and disclosure components of a *Pitchess* motion, and its ruling will not be disturbed absent an abuse of

that discretion.  (*Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1039; *Haggerty v. Superior Court* (2004) 117 Cal.App.4th 1079, 1086; *Hughes*, *supra*, 27 Cal.4th at p. 330.)

On appeal, this court is required to review the "record of the documents examined by the trial court," and determine whether the superior court abused its discretion in refusing to disclose the contents of the officer's personnel records pursuant to *Pitchess.* (*Mooc, supra,* 26 Cal.4th at p. 1229; *Hughes, supra,* 27 Cal.4th at p. 330.)  Defendant is entitled to "meaningful appellate review" of the confidential files which were before the superior court when it denied his *Pitchess* motion for disclosure.  (*Mooc, supra,* 26 Cal.4th at p. 1228.)

If there is any uncertainty in the record as to which documents were reviewed by the superior court, we may remand the matter with directions to conduct a hearing and clarify the materials it reviewed in camera before it denied the *Pitchess* motion.  (*Mooc, supra,* 26 Cal.4th at p. 1231.)

If this court determines that the superior court abused its discretion by denying disclosure of confidential records it had reviewed, reversal is not required unless the error was prejudicial under the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Samuels* (2005) 36 Cal.4th 96, 110; *People v. Gaines* (2009) 46 Cal.4th 172, 182–183 (*Gaines*).)  There must be a reasonable probability of a different outcome if potential impeachment evidence had been disclosed.  (*Gaines*, *supra*, 46 Cal.4th at p. 182.)  The determination of whether the court's error was prejudicial "involves an assessment or weighing of the persuasive value of the evidence that was presented and that *which should have been presented.*  [Citations.]"  (*Ibid*., italics added.)

## B.  <u>The court's original in camera review</u>

As explained *ante*, defendant's *Pitchess* motion was filed in conjunction with her motion to suppress evidence.  The *Pitchess* motion sought disclosure of Deputy Warmerdam's personnel records for complaints of acts or instances of dishonesty, false arrests, and the fabrication of charges, reports, and/or evidence, to impeach his

credibility, based on defendant's allegations that one of the deputies took the cash from defendant's property bag and it was unreasonable to conduct the strip search.

In this case, the prosecution conceded, and the superior court found, defendant's *Pitchess* motion established good cause for the superior court to conduct an in camera review of Deputy Warmerdam's confidential personnel records for any allegations of dishonesty.

On February 16, 2012, the court conducted an in camera review of Warmerdam's confidential personnel records. After the in camera hearing, the parties returned to the courtroom, and the court advised them that it had reviewed Deputy Warmerdam's records, and found there was no discoverable information. The court then conducted the evidentiary hearing on defendant's motion to suppress.

### C. **This court's order for a settled statement**

On appeal, defendant asked this court to review Warmerdam's confidential personnel records and the sealed transcript of the in camera hearing pursuant to *Mooc*, and determine whether the superior court abused its discretion when it denied discovery.

When the appellate record was prepared, this court determined the superior court did not keep copies of Warmerdam's confidential records it reviewed at the in camera hearing, and there were no records filed with this court which purported to be the records reviewed by the superior court at the in camera *Pitchess* hearing.

On July 2, 2012, this court ordered the superior court to augment the appellate record with the confidential records it reviewed during the February 16, 2012, in camera *Pitchess* hearing, and to seal the records filed with this court, in order for this court to review defendant's *Pitchess* contentions. We further ordered that if the superior court did not keep copies of those files, it should order the custodian to produce those records, conduct another confidential hearing, and prepare a confidential settled statement stating whether the records received from the custodian were the same records it previously reviewed; whether it had reviewed additional records at the previous in camera hearing;

31.

and any other pertinent information, with all records and transcripts to be filed under seal with this court.

### D. **The superior court's settled statement**

On July 20, 2012, the superior court conducted a confidential in camera hearing to prepare the settled statement on the *Pitchess* motion, as ordered by this court. Thereafter, the superior court filed a sealed settled statement with this court, and stated that the custodian of records appeared and presented certain files, and "[u]pon review of the files the [superior] court finds that there are materials contained in the file which were not reviewed by the court at the time of the in camera hearing held on February 16, 2012." Thereafter, the superior court transmitted the confidential settled statement and accompanying exhibits to this court under seal, in compliance with this court's order to perfect the appellate record.[18]

### E. **Analysis**

As noted above, the trial court has broad discretion in ruling on the disclosure components of a *Pitchess* motion, and its ruling will not be disturbed absent an abuse of that discretion. (*Alford v. Superior Court, supra,* 29 Cal.4th at p. 1039; *Haggerty v. Superior Court, supra,* 117 Cal.App.4th at p. 1086; *Hughes, supra,* 27 Cal.4th at p. 330.) On appeal, this court is required to review the "record of the documents examined by the trial court" and determine whether the superior court abused its discretion in refusing to disclose the contents of the officer's personnel records pursuant to *Pitchess.* (*Mooc, supra,* 26 Cal.4th at p. 1229; *Hughes, supra,* 27 Cal.4th at p. 330.)

However, this court cannot conduct the review required by *Mooc* when the custodian of records fails to comply with the superior court's *Pitchess* order to present the

---

**18** With the exception of the sentence quoted herein, we hereby order that the entirety of the superior court's settled statement of July 20, 2012, together with accompanying exhibits, shall remain sealed until further order of this court.

entirety of the personnel records, in order for that court to conduct the discretionary review required by statute.  (*Mooc, supra,* 26 Cal.4th at p. 1229; *Hughes, supra,* 27 Cal.4th at p. 330.)

We are very concerned about the custodian's apparent failure or inability to comply with the superior court's initial order to present the entirety of the confidential records at the February 16, 2012, *Pitchess* hearing.  The superior court could not have known that it was not reviewing the entirety of the file when it conducted the initial *Pitchess* review.  The custodian's error was discovered simply through the happenstance of the superior court's failure to preserve copies of the confidential documents it reviewed on February 16, 2012, and this court's order for a sealed settled statement to perfect the appellate record.

In an analogous situation, the proper remedy when the superior court "has erroneously rejected a showing of good cause for *Pitchess* discovery and has not reviewed the requested records in camera is not outright reversal, but a conditional reversal with directions to review the requested documents in chambers on remand. [Citation.]"  (*Gaines*, *supra*, 46 Cal.4th at p. 180.)  Thus, if the superior court had initially declined to conduct any in camera review, and we found it abused its discretion by making that ruling, we would conditionally reverse defendant's plea, remand for another *Pitchess* hearing, and direct the court to conduct the necessary review of confidential documents.

A similar remedy would have been appropriate if further proceedings had been necessary in this case.  Based on this court's resolution of the suppression motion, however, we find it unnecessary to order further additional proceedings pursuant to *Pitchess*.  We have concluded that the deputies were required to have reasonable suspicion to conduct the visual body cavity search, they did not have any reasonable suspicion, and defendant did not consent to the search.  We expect the custodians who

33.

respond to the superior court's *Pitchess* orders will fully comply with their statutory duties to present the entirety of the records requested by the court.[19]

## DISPOSITION

Defendant's plea is vacated and the judgment is reversed.

The superior court's confidential settled statement of July 20, 2012, and the confidential records filed with this court as exhibits to the settled statement, shall remain under seal with this court. The confidential personnel records shall not be subject to routine destruction until further order of this court. (See, e.g., *City of Los Angeles v. Superior Court* (2002) 29 Cal.4th 1, 11–13.)

_____
Poochigian, J.

WE CONCUR:


_____
Levy, Acting P.J.


_____
Kane, J.

---

[19] Given our resolution of defendant's suppression motion, we need not address her remaining issues.

34.